OPINION
{¶ 1} Defendant, Ronald Wade, appeals from his conviction and sentence for murder.
 {¶ 2} Defendant and his wife, Cynthia Wade, were married six years and had two four-year old twin boys. In the days leading up to her murder on March 25, 2005, Mrs. Wade had *Page 2 
asked Defendant for a divorce. Two or three weeks prior to March 25, 2005, Defendant told a co-worker that "his wife could go but his boys weren't going anywhere." Another co-worker heard Defendant tell someone on the phone on March 21 or 22, 2005, "Bitch, if you leave me, I'll kill ya."
 {¶ 3} Mrs. Wade submitted an application to rent an apartment at the Residenz apartment complex in Kettering. On her application Mrs. Wade listed herself, her two sons and another man, Jonathan Smith, as the occupants. The manager at the Residenz apartment complex contacted the manager at Georgetown of Kettering apartment complex, where the Wades lived at the time, to verify Mrs. Wade's rental history. The manager at Georgetown of Kettering, concerned that Mrs. Wade might be getting ready to break her lease which was not up until late September 2005, called and left a message on the Wade's answering machine on March 23, 2005, asking Mrs. Wade to let management know whether she intended to move. Defendant intercepted that message and mentioned it to his sister the following day.
 {¶ 4} On March 25, 2005, Defendant was not at work, and he spent the day at a friend's house. Defendant returned home about 5:00 p.m. Mrs. Wade told Defendant a friend of his had been there and just left, and that if Defendant hurried he *Page 3 
could probably catch him. Defendant then left in Mrs. Wade's vehicle to try and catch his friend. When Defendant exited the parking lot and stopped at Far Hills Avenue for oncoming traffic, Mrs. Wade's bookbag fell over and two Valentine's cards spilled out. Defendant read the two cards, which contained love notes written to Mrs. Wade by another man, Jonathan Smith.
 {¶ 5} Defendant testified that when he saw the cards he had to pick his heart up off the floor. Defendant immediately returned home to confront his wife about the cards. After an angry exchange of words about the cards, during which Defendant said, "What's this shit," and Mrs. Wade replied, "What the f — you think it is you dumb mother f____;," Mrs. Wade went back inside their upstairs master bedroom. Defendant followed her.
 {¶ 6} When Defendant entered the bedroom, Mrs. Wade held a samurai sword in her hands that Defendant kept hidden under the mattress. According to Defendant, after he asked his wife if she was going to stab him and told her that she couldn't hurt him, Mrs. Wade stabbed him three or four times in the abdomen. Defendant then took the sword away from Mrs. Wade and, "after something jumped in him," Defendant stabbed her one time in the abdomen. Mrs. Wade put the bed covers over *Page 4 
the blade and pulled the sword out of her abdomen and began to run down the stairs. She collapsed and fell down the stairs, landing near the front door.
 {¶ 7} Mrs. Wade suffered over thirty stab wounds, including five wounds that struck vital organs and were each potentially fatal. Although he testified that he doesn't remember anything that occurred after his wife fell down the stairs, Defendant called his sister, Jackie Williams, and told her, "I killed Cindy. She's laying on the floor behind the door. I'm gonna kill myself. Tell the kids I love em." Jackie Williams rushed to Defendant's apartment and saw Defendant's and his wife's vehicles were in the parking lot. Ms. Williams pounded on the doors and windows of Defendant's apartment and repeatedly called Defendant's phone. When Williams got no response, she called police.
 {¶ 8} When police forcibly entered Defendant's apartment hours later they discovered Mrs. Wade's body lying behind the front door. She was deceased. Defendant was lying on the couch with a slashed neck and six stab wounds in his abdomen. The sword was laying across his body and he was holding pictures of his two sons. Despite Defendant's claim that his wife stabbed him first in their upstairs bedroom, none of the blood found upstairs was Defendant's. His blood was found *Page 5 
downstairs near his wife's body and near the couch where police found him.
 {¶ 9} Defendant was indicted on one count of murder in violation of R.C. 2903.02(A). Following a jury trial, Defendant was found guilty as charged. The trial court sentenced Defendant to fifteen years to life.
 {¶ 10} Defendant timely appealed to this court from his conviction and sentence.
FIRST ASSIGNMENT OF ERROR
 {¶ 11} "THE TRIAL COURT ERRED WHEN IT DENIED DEFENDANT'S MULTIPLE MOTIONS FOR ACQUITTAL AND THE CONVICTION RESTS UPON LEGALLY INSUFFICIENT EVIDENCE."
 {¶ 12} When considering a Crim.R. 29 motion for acquittal, the trial court must construe the evidence in a light most favorable to the state and determine whether reasonable minds could reach different conclusions on whether the evidence proves each element of the offense charged beyond a reasonable doubt. State v. Bridgeman (1978), 55 Ohio St.2d 261. The motion will be granted only when reasonable minds could only conclude that the evidence fails to prove all of the elements of the offense. State v. Miles (1996), 114 Ohio App.3d 738.
 {¶ 13} A Crim.R. 29 motion challenges the legal sufficiency of the evidence. A sufficiency of the evidence argument *Page 6 
challenges whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law. State v. Thompkins, (1997),78 Ohio St.3d 380. The proper test to apply to such an inquiry is the one set forth in paragraph two of the syllabus of State v. Jenks (1991),61 Ohio St.3d 259:
 {¶ 14} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."
 {¶ 15} Defendant was found guilty of murder in violation of R.C.2903.02(A), which provides:
 {¶ 16} "No person shall purposely cause the death of another . . ."
 {¶ 17} The trial court also instructed the jury on Voluntary Manslaughter in violation of R.C. 2903.03(A):
 {¶ 18} "No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought *Page 7 
on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another . . ."
 {¶ 19} In convicting Defendant of murder, the jury necessarily rejected voluntary manslaughter. Defendant argues that the evidence was not legally sufficient to support his murder conviction. That does not follow merely because Defendant's conduct could have supported a conviction for voluntary manslaughter instead of murder, which was an issue for the jury to decide.
 {¶ 20} The principal difference between murder and voluntary manslaughter is that voluntary manslaughter involves a mitigating element: some serious provocation by the victim which is reasonably sufficient to incite a defendant to use deadly force. State v.Thomas (Jan. 10, 2003), Montgomery App No. 19131. To be serious, the provocation must be sufficient to arouse the passions of an ordinary person beyond the power of his or her control. State v. Shane (1992),63 Ohio St.3d 630; State v. Mack, 82 Ohio St.3d 198, 1998-Ohio-375. Words alone are not legally sufficient, in most situations, to incite the use of deadly force including admissions of infidelity. Shane; Thomas.
 {¶ 21} After Defendant read his wife's two Valentine's *Page 8 
cards and discovered that she was having an affair, he promptly confronted her. Angry words were exchanged and Mrs. Wade verbally taunted Defendant, admitting that she was having an affair. As we previously noted, however, admissions of infidelity alone are legally insufficient provocation to incite a person into using deadly force.Shane.
 {¶ 22} Defendant nevertheless argues that more than mere words are involved in this case because, in addition to his wife's admitting she was having an affair, his wife threatened him with the samurai sword and then stabbed him three or four times in the abdomen, and that those facts and circumstances, taken together, constitute sufficient serious provocation to bring on a sudden passion or sudden fit of rage and incite Defendant into using deadly force. Even were we to agree that all of those factors when combined could constitute serious provocation, the problem with Defendant's claim is that the evidence presented at trial, when construed in a light most favorable to the state, does not support Defendant's version of the events.
 {¶ 23} Construed in a light most favorable to the state, the evidence demonstrates that Defendant knew weeks before this killing that his wife wanted a divorce and was planning on leaving him. Defendant told co-worker Mary Cooley that his *Page 9 
wife could go, but his boys weren't going anywhere. Defendant also expressed before this murder what he intended to do if his wife left him. Only three or four days before this murder, co-worker Jeremy Hawks heard Defendant tell someone on the telephone who reasonably could only have been Defendant's wife, "Bitch, if you leave me, I'll kill ya."
 {¶ 24} Just two days prior the murder, Defendant intercepted a phone message intended for his wife, wherein the manager of the apartment complex where they lived asked Mrs. Wade to call her to discuss Mrs. Wade's intention to move. Defendant spoke to his sister about the phone message the day before the murder occurred, indicating that he had gotten a phone message about his wife checking out another apartment.
 {¶ 25} Finally, although Defendant claims that his wife stabbed him first when they were in their upstairs master bedroom, none of the blood found in that bedroom or anywhere upstairs belonged to Defendant. Only Mrs. Wade's blood was found upstairs. Defendant's blood was discovered downstairs in the area where his wife's body was discovered, near the living room couch where police found Defendant. Furthermore, the call Defendant made to his sister after he attacked his wife supports a finding that this was a murder/attempted suicide. Defendant said, "I killed Cindy. She's laying on *Page 10 
the floor behind the door. I'm going to kill myself. Tell my kids I love em."
 {¶ 26} Viewing the evidence in a light most favorable to the State, as we must, a rational trier of facts could find that there was not sufficient serious provocation by Mrs. Wade to bring on a sudden passion or sudden fit of rage and incite Defendant into using deadly force, and that Defendant purposely killed his wife because she was having an affair and was going to leave him, and that all of the essential elements of murder were proven beyond a reasonable doubt. Defendant's conviction is supported by legally sufficient evidence, and the trial court properly overruled his motions for acquittal.
 {¶ 27} Defendant's first assignment of error is overruled.
SECOND ASSIGNMENT OF ERROR
 {¶ 28} "THE TRIAL COURT ERRED WHEN IT OVERRULED THE DEFENDANT'S OBJECTIONS TO EVIDENCE WHEN THE NATURE OF THE PICTURES AT ISSUE WERE SUBSTANTIALLY PREJUDICIAL AND CUMULATIVE AND THE PROBATIVE VALUE WAS MINIMAL."
 {¶ 29} Defendant argues that the trial court abused its discretion in admitting multiple autopsy photographs because, even though they were relevant, their probative value was substantially outweighed by the danger of unfair prejudice due to their gruesome nature, and accordingly these photos should *Page 11 
have been excluded pursuant to Evid.R. 403(A). Specifically, Defendant objected to slides six, seven and twelve because of the graphic nature of the stab wounds they depicted, and slides thirteen and sixteen through twenty-one because they depict various internal organs: sternum with rib cage attached, heart, lungs, liver, spleen and kidney that had been removed from the victim's body in order to show the stab wounds to those organs, any one of which could have been fatal. The trial court overruled Defendant's objections and admitted the pictures because of their probative value in demonstrating the stab wounds Defendant inflicted upon the victim and the cause of the victim's death.
 {¶ 30} The admission or exclusion of evidence such as photographs is left to the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of that discretion. State v.Morales (1987), 32 Ohio St.3d 252, 257; State v. Simpson (February 13, 2004), Montgomery App. No. 19797, 2004-Ohio-669. An abuse of discretion means more than a mere error of law or an error in judgment. It implies an arbitrary, unreasonable, unconscionable attitude on the part of the trial court. State v. Adams (1980), 62 Ohio St.2d 151.
 {¶ 31} The State had the burden to prove that Defendant purposely caused his wife's death. R.C. 2903.02(A). The *Page 12 
particular cause of her death was susceptible to proof through the testimony of the physician who performed the autopsy. The slides/photographs were clearly probative of such matters and were presented during the testimony of Dr. Russell Uptegrove, who performed the autopsy on Cynthia Wade, for the purpose of explaining to the jury his opinion concerning the cause of Mrs. Wade's death by illustrating the location and severity of the stab wounds inflicted by Defendant and his purpose in doing so. Simpson. Each photograph had independent probative value for that purpose, and we cannot say that the probative value was substantially outweighed by the danger of unfair prejudice to Defendant.
 {¶ 32} Defendant argues that several of the slides depict especially gruesome matters that go beyond the burden the State had to meet. He complains that several exaggerate the wounds he inflicted because, in them, the body is manipulated to show the wounds in a way that enlarges the laceration shown. Also, the several photographs of internal organs that were removed from the victim's body were unnecessary.
 {¶ 33} The State had the burden to prove that Defendant acted "purposely," that is, with the specific intention to cause his wife's death. R.C. 2901.22(A). The slides showing internal organs and other body parts are illustrative of the *Page 13 
ferocity of Defendant's attack. For example, the victim's liver is shown severed in two, (State's Exhibit 21-A), as it was found when her body was opened. Also, the photo of the sternum and rib cage (State's Exhibit 15-A) depict deep, multiple stab wounds that would require a great effort to inflict.
 {¶ 34} Such evidence is probative of the allegation that the Defendant acted purposely to cause his wife's death. It is therefore relevant and was admissible for that purpose. Evid.R. 401, 402. It was likewise admissible to rebut the proposition that Defendant had instead knowingly engaged in the conduct that caused his wife's death, which is the finding required by the voluntary manslaughter instruction Defendant requested and which the court gave.
 {¶ 35} Finally, we are not persuaded that photos showing the body manipulated are unduly prejudicial. They illustrate the extent of the wounds Defendant inflicted. Autopsy photos are inherently prejudicial when they depict gruesome, graphic wounds, but when offered to prove elements of the offense that the State has the burden of proving, they are usually not unfairly prejudicial. That is the case here. As to the sheer number of autopsy photographs introduced, Defendant does not complain that they are duplicative. We note that Defendant *Page 14 
was alleged to have inflicted over thirty separate stab wounds to his wife, and each photo he complains about fairly depicts a separate wound or injury, all of which are a product of Defendant's handiwork. That evidence is damning, but not unfairly prejudicial. The trial court did not abuse its discretion in admitting the autopsy photographs.
 {¶ 36} Defendant's second assignment of error is overruled.
THIRD ASSIGNMENT OF ERROR
 {¶ 37} "THE DEFENDANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO AN ATTORNEY BECAUSE OF INEFFECTIVE ASSISTANCE OF COUNSEL."
 {¶ 38} Counsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance. Strickland v. Washington (1984),466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must demonstrate that were it not for counsel's errors, the result of the trial would have been different. Id., State v. Bradley (1989),42 Ohio St.3d 136.
 {¶ 39} Defendant argues that his trial counsel performed deficiently because he failed to object (1) to the prosecutor's use of leading questions to the State's witnesses, (2) to hearsay elicited when Detective Simoni read *Page 15 
into the record the contents of the two Valentine cards addressed to Cynthia Wade that Defendant found, and (3) argumentative questions the prosecutor asked Defendant during cross-examination.
 {¶ 40} Under both Strickland and Bradley, an error by counsel does not warrant setting aside a judgment of conviction if the error had no effect on the judgment. Reversal is warranted only when the defendant demonstrates that there is a reasonable probability that but for counsel's errors, the result of the trial or proceeding would have been different. Id.
 {¶ 41} Although Defendant presents string citations to the trial transcript to demonstrate various instances where Defendant alleges counsel performed deficiently by failing to object, Defendant does not even suggest, much less demonstrate, how an objection in any of those instances would have made any difference in the outcome of this trial. In other words, Defendant has not demonstrated a reasonable probability that but for counsel's errors in failing to object, the outcome of this trial would have been different, i.e., he would not have been found guilty of murder. Defendant's inability to demonstrate prejudice, as defined by Strickland, is hardly surprising, given the strength of the *Page 16 
State's evidence against Defendant. Ineffective assistance of counsel has not been demonstrated.
 {¶ 42} Defendant's third assignment of error is overruled. The judgment of the trial court will be affirmed.
 BROGAN, J. And FAIN, J., concur. *Page 1