OPINION
{¶ 1} Dennis Cole Flanigan appeals from his conviction and sentence on two counts of aggravated vehicular homicide while under the influence of alcohol. Following a jury trial, Flanigan was found guilty and sentenced to six years in prison on each count *Page 2 
to run consecutively for a total of twelve years. Additionally, the court suspended Flanigan's driver's license for a mandatory term of life.
 {¶ 2} In support of his appeal, Flanigan raises the following assignments of error:
 {¶ 3} "I. State v. Foster [109 Ohio St.3d 1, 2006-Ohio-856,845 N.E.2d 470, requiring that this matter be remanded for re-sentencing].
 {¶ 4} "II. The trial court erred by admitting evidence with a prejudicial effect that greatly outweighed any probative value.
 {¶ 5} "III. Appellant's sentence is inconsistent with sentences for similar crimes.
 {¶ 6} "IV. The trial court erred by excluding the state's witness' contradictory sworn statements that provided exculpatory and impeachment evidence to Appellant.
 {¶ 7} "V. The trial court erred by denying Appellant access to Ryan Smith's medical records.
 {¶ 8} "VI. The verdicts are against the sufficiency and manifest weight of the evidence."
 {¶ 9} Upon our review of the record, we find Flanigan's first assignment of error has merit, while assignments of error two through six will be overruled. Because his sentence was imposed prior to the Ohio Supreme Court's holding in State v. Foster, supra, the sentence must be vacated. The judgment of the trial court will be reversed, and the matter will be remanded for re-sentencing.
 {¶ 10} This case arises from a fatal car crash that occurred on September 10, 2004. The events leading up to the tragic accident began with a small party at the house of one of the victims, James Kruse. At the party were Flanigan, Ryan Smith, *Page 3 
Edward Riley Smith, and Kruse. Also present were Tiffany Duncan, Ryan Smith's girlfriend, and her friend, Nicole Lewis. The plan was to drink at Kruse's house because his father was not going to be home that evening. Each person contributed money, and Flanigan, being the only one present who was twenty-one, bought the alcohol-a bottle of Riva Vodka, a 24-pack of Bud Lite bottles, and a 6-pack of Bud Ice bottles. The party lasted until Kruse's father returned earlier than expected and told the group that they could not drink at his house. He did, however, ask that they remain there until they were sober enough to drive. At that point in time, approximately one-half of the bottle of vodka and several beers had been consumed. Shortly after, the group left and headed to a local bar named T.J. Chumps. Flanigan, Ryan, Riley and James traveled in Flanigan's car, and Tiffany and Nicole traveled in Ryan's car.
 {¶ 11} At T.J. Chumps, the group hung out and drank beer in the parking lot. Witnesses testified that Flanigan revved the engine of his car to the point that smoke billowed out. When asked by one of the employees if he needed a fire extinguisher, Flanigan became belligerent and told him to mind his own business. Other employees took notice of this disruptive behavior. Eventually, the group tried get into the bar, but they were refused admission. Only Ryan was allowed to enter in order to talk to his mother. She was there singing karaoke that night. Ryan's mother told him to get Flanigan home.
 {¶ 12} After being told they were not permitted to enter the bar, Flanigan stormed off. One account indicates that he took off his shirt, wrapped it around his fist and punched the sides of cars as he made his way through the parking lot. Back at the cars, witnesses testified that Flanigan got into the driver's seat of his Honda Accord. Ryan *Page 4 
called "shotgun" and got into the front passenger's seat. James and Riley climbed into the back seat. The plan was to go to Flanigan's house. The group of boys pulled out of T.J. Chumps first, and they were followed by Tiffany, Nicole, and Allan Lilly, Nicole's boyfriend who had met them while at the bar. Tiffany testified that a red light on First and Linden came between the two cars. By the time she turned onto Linden, the Honda was out of sight. Instead of taking Linden to Jamaica Road, the road on which Flanigan lived, she turned down Riverview. They arrived at Flanigan's house soon after.
 {¶ 13} Flanigan, Ryan, Riley and James, however, did not make it to Flanigan's house. Ryan Smith testified at trial that while traveling down Jamaica Road at a high rate of speed, Flanigan pulled up on the emergency brake, causing the vehicle to skid and swerve off of the road. An accident reconstructionist testified that the car was traveling at a minimum speed of 72 miles per hour. The right rear side of the Honda collided with a tree, which caused the car to rotate clockwise. The left side then skidded into the lip of the front porch of 7690 Jamaica Road. This resulted in the car flipping up and hitting the ceiling of the house before coming to rest upside down on the porch with the passenger side against the house. By this point, the rear of the vehicle had been completely severed.
 {¶ 14} A neighbor, Annette Jarnigan, heard the crash. When she went across the street to see what had happened, she at first did not notice the vehicle on the front porch; however, she eventually saw a flashing blinker. Jarnigan's son called the police.
 {¶ 15} After realizing this was a car crash, Jarnigan and her son began to look for survivors. While doing so, they heard some noise coming from the front of the vehicle. There they saw Ryan Smith standing by the front passenger area. Jarnigan also saw *Page 5 
the body of Riley Smith lying behind the rear tire of the car. She took Ryan away from the wreck and tried to find out what had happened. According to Jarnigan, Ryan appeared confused and disoriented. He asked her what had happened, what car were they in, and what color the car was. He also told Jarnigan that he was not driving, and then he said his friends made him drive, and then he repeated he was not driving.
 {¶ 16} Momentarily, police and rescue officials began arriving on the scene. First to arrive was German Township police officer, Steven Marsden. He approached Jarnigan, her son and Ryan and asked what had happened. Ryan responded that he did not know. However, he did tell the officer that he was not driving.
 {¶ 17} While talking to Officer Marsden, Jarnigan heard a gasp from the wreck and became aware that Flanigan was still inside the car. Officer Marsden shined his flashlight into the vehicle, and Flanigan responded by flickering his eyes. Flanigan's body was trapped within the driver's area by the driver's headrest. His legs were pointing toward the driver's side door, and he was supporting his body with his right arm. In order to extricate Flanigan from the car, the driver's side head rest had to be removed.
 {¶ 18} Once out of the vehicle, Flanigan was taken to Miami Valley Hospital by Care Flight. Ryan Smith was also taken to Miami Valley hospital, but by ambulance. Riley Smith and James Kruse, who had been propelled out the back of the vehicle by the force of the crash, died at the scene.
 {¶ 19} Ryan remained in the hospital for two days. His injuries included a gash on the back of his head, over his right eye, and across his tongue — all requiring stitches; some bruises on his hips; and a cut underneath his chin. *Page 6 
 {¶ 20} Flanigan remained in the hospital for two weeks due to extensive injuries. He sustained a severe fracture to his left arm, his right ear had been almost completely severed, and he had gashes above both eyes that required stitches.
 {¶ 21} On November 1, 2004, a grand jury indicted Flanigan on two counts of aggravated vehicular homicide (under the influence), in violation of R.C. 2903.06(A) (1 )(a); two counts of aggravated vehicular homicide (recklessly), in violation of 2903.06(A)(2); one count of aggravated vehicular assault, in violation of R.C. 2903.08(A)(1)(a); and one count of vehicular assault, in violation of 2903.08(A)(2). Flanigan pled not guilty. Following a jury trial, the jury returned a verdict finding Flanigan guilty of two counts of aggravated vehicular homicide (under the influence) and not guilty on all remaining counts. He was sentenced to six years in prison on each count to run consecutively for a total of twelve years. The court also suspended Flanigan's driver's license for a mandatory term of life. It is from this conviction and sentence that the present appeal comes.
 I {¶ 22} In his first assignment of error, Flanigan argues that sentences imposed prior to the Ohio Supreme Court's decision inState v. Foster, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470, in addition to cases pending on direct review or cases that a defendant has not appealed but whose appeal time has not expired, must be remanded for re-sentencing. In contrast, the state contends that Flanigan waived his right of review under Foster when he failed to raise sentencing issues at trial. Specifically, the state asserts that Flanigan could have predicted the outcome of Foster based upon the *Page 7 
United States Supreme Court's holdings in Blakely v. Washington (2004),542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 and U.S. v. Booker (2005),543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621. We disagree with the state's argument and conclude that Flanigan's sentence must be vacated pursuant to State v. Foster, supra.
 {¶ 23} We find that our decision in State v. Lynn, Montgomery App. No. 21484, 2007-Ohio-438, expressly facilitates the disposition of this matter. In Lynn, we rejected the state's argument that the defendant waived his right to appeal a defect in his sentence underFoster when he failed to object to his sentence at trial. Although the state, as here, argued that the defendant should have predicted the outcome of Foster based on the United States Supreme Court's decision inBlakely, supra, we specifically noted that the Ohio Supreme Court has made "no exception for cases in which the sentence was imposed afterBlakely v. Washington was decided and no objection was interposed to the sentence." Furthermore, we provided:
 {¶ 24} "In our view, even if we were to regard the waiver issue as open, after State v. Foster, supra, we conclude that successful prediction of the outcome of State v. Foster was at least as problematic as successful prediction of the outcome of Blakely v. Washington, supra, so that even after Blakely v. Washington was decided, a criminal defendant's failure to have anticipated the application ofBlakely in State v. Foster would be no more a knowing and intelligent waiver than would a criminal defendant's failure to have anticipated the extension of Apprendi v. New Jersey [(2000), 530 U.S. 466,120 S.Ct. 2348, 147 L.Ed.2d 435] in Blakely." Lynn, 2007-Ohio-438, at]}26. Likewise, we find the same rationale applies when the defendant's sentence is imposed following the United States Supreme Court's decision in Booker, supra. *Page 8 
 {¶ 25} Accordingly, the first assignment of error is sustained. Flanigan's sentence must be vacated, and this cause must be remanded for re-sentencing under the authority of State v. Foster, supra.
 II {¶ 26} Under his second assignment of error, Flanigan contends that the trial court erred by admitting graphic photographs of the victims' bodies and witness testimony as to past acts whose prejudicial effect greatly outweighed any probative value.
 {¶ 27} First, Flanigan argues that the probative value of the state's exhibits 8-10 and 19-21, which are autopsy photographs depicting internal head injuries of James Kruse and Riley Smith, is substantially outweighed by the photographs' prejudicial effect on the jury. Photographs eight through ten illustrate James Kruse's injuries. The first shows the occipital part of Kruse's scalp; photograph nine shows a subarachnoid hemorrhage, i.e., bleeding around the brain, taken from Kruse's right profile; and photograph ten shows Kruse's skull with his brain removed in order to highlight a skull fracture. Photographs 19 through 21 illustrate Riley Smith's injuries. Photograph 19 shows a forehead contusion and left posterior scalp contusion; photograph 20 is parallel to photograph 9, showing a subarachnoid hemorrhage in Smith's brain; and the last photograph shows a hinge fracture at the base of Smith's skull. According to the defendant, these photographs should have been excluded due to their graphic and prejudicial nature.
 {¶ 28} The state responds by claiming that the photographs corroborated and *Page 9 
illustrated the testimony of Dr. Kent Harshbarger, a forensic pathologist and deputy coroner for the Montgomery County Coroner's Office. The state argues that the photographs' probative value in establishing cause of death outweighed their potentially prejudicial effect. Flanigan, in contrast, asserts that sufficient alternative evidence existed to prove cause of death.
 {¶ 29} Flanigan cites State v. Maurer (1984), 15 Ohio St.3d 239, 266,15 OBR 379, 473 N.E.2d 768, for the proposition that gruesome photographs illustrative of forensic evidence are not admissible if they cause material prejudice. This court has noted that Maurer is confined to establishing a standard for the admissibility of gruesome photographs in capital cases. See State v. Lockhart (Jan. 16, 1998), Montgomery App. No. 15955, 1998 WL 12680, at *5. Instead, applicable to the present matter is the standard set by Evid.R. 403.
 {¶ 30} Evid.R. 403 provides, in pertinent part, that "[although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." The admission or exclusion of photographs under Evid.R. 403 is left to the sound discretion of the trial court. State v. Hill (1967), 12 Ohio St.2d 88, 41 O.O.2d 369,232 N.E.2d 394, paragraph two of the syllabus. The admissibility of such evidence will not be disturbed on appeal absent an abuse of discretion.State v. Wade, Montgomery App. No. 21530, 2007-Ohio-1060, at 1J30. An abuse of discretion implies an arbitrary, unreasonable or unconscionable attitude of the trial court. Id. (citation omitted).
 {¶ 31} Here, while there is no dispute that the impact from the crash directly caused the deaths of James Kruse and Riley Smith, we do not find the admission of *Page 10 
these photographs to be an abuse of discretion. See State v. Lakes, Montgomery App. No. 21490, 2007-Ohio-325, at ?19-21 (finding the admission of autopsy photographs was not an abuse of discretion even though no party disputed that the victim died of a gunshot wound to his abdomen). The trial court reasonably defined their purpose as corroborating the testimony of the deputy coroner as to the nature of the young men's injuries, in addition to the cause of their deaths. Thus, Flanigan's first contention lacks merit.
 {¶ 32} Next, the defendant argues that evidence demonstrating he had pulled the emergency brake on several occasions while driving during the summer prior to the accident at issue was inadmissible. Flanigan contends that this evidence must be excluded under Evid.R. 404(B) as evidence of prior bad acts presented solely to establish conformity with his alleged criminal conduct.
 {¶ 33} Evid.R. 404(B) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."
 {¶ 34} Here, the state argues that evidence of Flanigan's other acts is necessary to prove identity in light of the defense's position that Flanigan was not driving the vehicle. "Identity is in issue when the fact of the crime is open and evident but the perpetrator is unknown and the accused denies that he committed the crime." State v. Myers (Feb. 12, 1999), Greene App. No. 96 CA 38, 1999 WL 94917, at *4. The Ohio Supreme Court has held that evidence of other acts may be presented to prove identity *Page 11 
by establishing a modus operandi applicable to the crime with which the defendant is charged. State v. Lowe (1994), 69 Ohio St.3d 527, 531,634 N.E.2d 616. There, the court stated the following:
 {¶ 35} "`Other acts may be introduced to establish the identity of a perpetrator by showing that he has committed similar crimes and that a distinct, identifiable scheme, plan, or system was used in the commission of the charged offense.' State v. Smith (1990),49 Ohio St.3d 137, 141, 551 N.E.2d 190, 194. While we held in Jamison [(1990),49 Ohio St.3d 182, 552 N.E.2d 180, syllabus] that `the other acts need not be the same as or similar to the crime charged, ` Jamison, syllabus, the acts should show a modus operandi identifiable with the defendant.State v. Hutton (1990), 53 Ohio St.3d 36, 40, 559 N.E.2d 432, 438.
 {¶ 36} "A certain modus operandi is admissible not because it labels a defendant as a criminal, but because it provides a behavioral fingerprint, which, when compared with the crime in question, can be used to identify the defendant as the perpetrator. Other-acts evidence is admissible to prove identity through the characteristics of acts rather than through a person's character. To be admissible to prove identity through a certain modus operandi, other-acts evidence must be related to and share common features with the crime in question." (Emphasis sic.) Id.
 {¶ 37} We agree with the trial court's conclusion that Flanigan's prior pulling of the emergency brake on several instances during the summer of 2004 established a modus operandi applicable to the conduct underlying his conviction. Ryan Smith testified that on one occasion, the defendant bragged to him about pulling up the "E-brake" and narrowly missed sliding off of the road into a ditch. (Tr. at 622.) Present in *Page 12 
the car with Flanigan at that time were Holden Fugate and Ricky Jargon. Smith also testified that he and his girlfriend, Tiffany Duncan, were traveling to Kroger with the defendant in July or August of 2004, and that Flanigan pulled up on the emergency brake without warning in the parking lot. According to Smith, they were only going approximately 20 miles per hour.
 {¶ 38} We note that Smith, on cross examination, also admitted to pulling up the emergency brake on one occasion of a car he was driving. The defendant argues that this evidence precludes the court from finding that his prior acts establish a "fingerprint" of his criminal behavior. We disagree. In this court's opinion, these competing testimonies of other acts are separate and distinct from each other. It is the responsibility of the jury to weigh the credibility of each witness' testimony, found to be properly admitted, in reaching its decision.
 {¶ 39} In addition, Brandon Horne testified at trial that he, too, had been in a car with Flanigan when Flanigan pulled the emergency brake while driving. Horne provided that during the same summer, he and Flanigan were on their way to buy cigarettes when the defendant pulled up on the emergency brake approximately 50 yards before a stop sign. Because they were only traveling 25 to 30 miles per hour, Horne stated that the car fishtailed a little to the right and left, and then the two simply continued on.
 {¶ 40} The trial court reasonably determined that the pulling up of the emergency brake was the behavioral fingerprint shared by the prior acts and the crime charged. It also selectively excluded other accounts of Flanigan's driving record that did not comport with this unique pattern of behavior.
 {¶ 41} We find that the trial court did not err in admitting evidence of these other *Page 13 
acts under the proof-of-identity exception to Evid.R. 404(B). Furthermore, we do not find that the probative value of this evidence was substantially outweighed by its prejudicial effect. As we stated above, Evid.R. 403(A) provides that relevant evidence "is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." When reviewing matters decided under Evid.R. 403, an appellate court "`should be slow to interfere unless the court has clearly abused its discretion and a party has been materially prejudiced thereby.'"State v. McGill (Dec. 8, 2000), Greene App. No. 99CA25, 2000 WL 1803650, at *18 (citations omitted). Here, the trial court carefully admitted only the evidence it determined established a modus operandi, while excluding evidence of other acts too dissimilar to the charged offense. As the identity of the driver was raised by the defendant, we do not believe the trial court abused its discretion in finding that the probative value of these other acts in addressing the limited issue of identity outweighed any potential prejudicial effect on the jury. Accordingly, Flanigan's second assignment of error is overruled.
 III {¶ 42} Flanigan contends in his third assignment of error that the trial court's sentence of two six-year consecutive prison terms violates R.C. 2929.11(B). This provision states that "[a] sentence imposed for a felony shall be reasonably calculated to achieve the two overriding purposes of felony sentencing set forth in division (A) of this section, commensurate with and not demeaning to the seriousness of the offender's conduct and its impact upon the victim, and consistent with sentencesimposed for *Page 14 similar crimes committed by similar offenders." (Emphasis added.) Flanigan cites four cases from the Second Appellate District in support of his argument.
 {¶ 43} Our review of the record, however, reveals that Flanigan did not raise this issue with the trial court at the time of sentencing. InState v. Bell, Greene App. No. 2004-CA-5, 2005-Ohio-655, we held that a failure to raise a sentencing-inconsistency issue in the trial court waives the defendant's right to raise such issue on appeal. There, we provided the following:
 {¶ 44} "`R.C. 2929.11(B) imposes a duty upon the trial court to insure consistency among the sentences it imposes. * * * [It is] also recognized, however, that trial courts are limited in their ability to address the consistency mandate, and appellate courts are hampered in their review of this issue, by the lack of a reliable body of data upon which they can rely. * * * `[Although a defendant cannot be expected to produce his or her own database to demonstrate the alleged inconsistency, the issue must at least be raised in the trial court and some evidence, however minimal, must be presented to the trial court to provide a starting point for analysis and to preserve the issue for appeal. ` Having failed to raise this issue at sentencing, [the defendant] cannot now argue that the sentence imposed by the trial court was inconsistent with those imposed on similar offenders.'" Id. at T|140, quoting State v. Roberts, Cuyahoga App. No. 84070, 2005-Ohio-28, at ]}60. See, also, State v. Cantrell, Champaign App. No. 2005-CA-4,2006-Ohio-404, at ?55.
 {¶ 45} Because Flanigan failed to bring this sentencing-inconsistency issue to the attention of the trial court, we find that he has waived this argument on appeal. Therefore, Flanigan's third assignment of error is overruled. *Page 15 
 IV {¶ 46} In his fourth assignment of error, Flanigan argues that the trial court erred in excluding civil deposition testimony of Ryan Smith, in which Smith testified that he told Annette Jarnigan he had been driving the vehicle the night of the accident.
 {¶ 47} When cross-examined by defense counsel concerning the statements he made to Annette Jarnigan on the night of the accident, state's witness, Ryan Smith, testified that he didn't remember saying that he had been driving the car. The following exchange took place during cross-examination:
 {¶ 48} "Q. Now, after the crash occurs, you're standing outside by the vehicle and Annette Jarnigan comes over to you?
 {¶ 49} "A. Yes.
 {¶ 50} "Q. You remember that, right?
 {¶ 51} "A. Yes.
 {¶ 52} "Q. You remember the woman walked you over, put you down on the concrete slab and started asking you questions, right?
 {¶ 53} "A. Right.
 {¶ 54} "Q. And she asked you were you driving the vehicle, right?
 {¶ 55} "A. Yes.
 {¶ 56} "Q. And you said you were driving because your friends made you drive. That's what you told the woman, didn't you?
 {¶ 57} "A. I don't remember exactly saying that.
 {¶ 58} "Q. What did you say, then? *Page 16 
 {¶ 59} "A. I remember asking her what kind of car it was and what happened and she couldn't tell me.
 {¶ 60} "Q. And then she said, were you driving the car? And you said, I was driving because my friends made me drive. That's what you said, isn't it?
 {¶ 61} "A. I don't remember saying that.
 {¶ 62} "Q. Do you remember testifying at a deposition?
 {¶ 63} "MR. DESCHLER: Objection, your Honor.
 {¶ 64} "THE COURT: Sidebar." (Tr. at 631-32.)
 {¶ 65} During the sidebar, defense counsel provided the following regarding Smith's testimony under oath as part of a civil deposition: "That he testified, he said to her she just — like we said earlier — she came over, walked with him and then she asked him if he was driving. He said he was not driving and then he said he was driving because his friends made him drive. That's what he said." Defense counsel argued that this statement should have been admitted for impeachment purposes, as it was inconsistent with Smith's testimony at trial that he didn't remember telling Annette Jarnigan he had been driving. The state, however, raised an objection founded on Montgomery County Common Pleas Court's Management Plan, Loc.R. 3.03 (I)(D)(2)(d) and (f). Under this "open discovery" plan, the prosecutor is obliged to deliver an information packet that contains, among other relevant discovery items within the state's possession, custody or control, "all witness statements" upon the execution of a Demand and Receipt by the defendant. See Loc.R. 3.03 (I)(D)(2)(d)(2). Acceptance of this information packet then obligates the defendant to provide reciprocal discovery to the state: *Page 17 
 {¶ 66} "The execution of a demand and receipt for an information packet and the acceptance of an information packet by counsel for the defendant automatically obligates the defendant to provide to the prosecutor reciprocal discovery as set forth in Section (I)(D)(2)(d) of this local rule and as required by Rule 16 of the Ohio Rules of Criminal Procedure." Loc.R. 3.03 (I)(D)(2)(f).
 {¶ 67} After hearing both arguments, the trial court excluded the evidence. The court ruled that Flanigan's defense counsel was obligated under the local rules to provide Smith's deposition statement to the state, for defense counsel had been in possession of the statement and intended to use it for precisely these circumstances. The court pointed out, however, that excluding the deposition testimony would not preclude Smith's statements from being heard by the jury. Defense counsel acknowledged that he planned to call Jarnigan to the stand in order to elicit her testimony as to Smith's statements made to her the night of the accident.
 {¶ 68} Our review of the record shows that Flanigan's trial counsel executed a Demand and Receipt for discovery information pursuant to the court's Management Plan on November 9, 2004. Explicit in the demand document is a provision stating that "[t]he Assistant Prosecuting Attorney requests, and the defense hereby agrees to furnish, full reciprocal discovery under Criminal Rule 16(C) and the Court ManagementPlan." (Emphasis added.) (Df.'s Req. for Disc. at 3.) According to the state, Flanigan's failure to provide a copy of the civil deposition testimony of Ryan Smith after executing a Demand and Receipt warranted the trial court's decision to exclude such testimony.
 {¶ 69} We also note that the trial court thoroughly analyzed this issue. The court's analysis recognized that under Crim.R. 16, defense counsel would not be *Page 18 
obligated to disclose to the prosecution before trial the prior statement of this witness, nor would the state be obligated to disclose prior statements made by witnesses to the state or its agents. See Crim.R. 16(C)(2); Crim.R. 16(B)(2). However, the court also pointed out the voluntariness of parties operating under the local rules. Here, the state agreed to provide full discovery upon the demand of Flanigan's defense counsel. According to the trial court, where the state agrees to provide the information packet, including witness statements that it is not obligated to disclose under Crim.R. 16, the defense, upon receiving such statements, agrees to provide reciprocal discovery.
 {¶ 70} We agree with the trial court. This court does not deny that an inconsistency between Loc.R. 3.03 and Crim.R. 16 exists, and that we have held where Loc.R. 3.03 is inconsistent with Crim.R. 16, it is unenforceable. See State v. Stapleton (June 22, 1994), Montgomery App. No. 13579, 1994 WL 277852, at *6; State v. Lambert (Mar. 16, 1993), Montgomery App. No. 13483, 1993 WL 79273, at *5, vacated on other grounds (1994), 69 Ohio St.3d 356, 632 N.E.2d 511. However, we also believe that "[t]hese local rules survive based on the voluntary compliance by prosecutors." State v. Boyce (Aug. 6, 1999), Greene App. No. 98-CA-95, 1999 WL 959180, at *3 (citations omitted). Here, the parties agreed at the onset of this matter to conduct discovery pursuant to Montgomery County's "open discovery" management plan. Defense counsel made the request for full discovery on November 9, 2004, acknowledging by his signature that he would reciprocate with full discovery under both Crim.R. 16(C) and the court's management plan. In doing so, we find that defense counsel waived his right to challenge Smith's inconsistent statement with a document that it failed to supply the state in violation of the local rules. In our opinion, exclusion of this evidence did not *Page 19 
deny Flanigan a fair trial, as he argues in his brief, because the identical "inconsistent" statement was presented to the jury through the testimony of Jarnigan herself. Finding that the trial court did not err in excluding Smith's civil deposition testimony, Flanigan's fourth assignment of error is overruled.
 V {¶ 71} Flanigan argues in his fifth assignment of error that the trial court erred in denying him access to Ryan Smith's medical records. Specifically, Flanigan contends that the records were admissible under the Health Insurance Portability and Accountability Act ("HIPAA"), Section 164.512, Title 45, C.F.R., which provides that "[a] covered entity may use or disclose protected health information to the extent that such use or disclosure is required by law and the use or disclosure complies with and is limited to the relevant requirements of such law." Section 164.512(a)(1), Title 45, C.F.R. Furthermore, "[a] covered entity must meet the requirements described in paragraph (c), (e), or (f) of this section for uses or disclosures required by law." Section 164.512(a)(2), Title 45, C.F.R. Section (e) states that protected health information may be disclosed in a judicial or administrative proceeding in response to a court order, subpoena, discovery request or other lawful purpose.
 {¶ 72} The state, in opposition, argues that Smith's medical records are protected by Ohio's physician-patient privilege, codified in R.C.2317.02(B). This statute, in pertinent part, provides that "[t]he following persons shall not testify in certain respects:
 {¶ 73} "(B) (1 ) A physician or a dentist concerning a communication made to the physician or dentist by a patient in that relation or the physician's or dentist's advice to a patient, except as otherwise provided in this division, division (B)(2), and division (B)(3) *Page 20 
of this section, and except that, if the patient is deemed by section2151.421 [2151.42.1] of the Revised Code to have waived any testimonial privilege under this division, the physician may be compelled to testify on the same subject." According to the state, the statutory exceptions of division (B)(2) and (B)(3) are not applicable to this matter, and Smith has not waived his physician-patient privilege.
 {¶ 74} For the following reasons, we agree with the state and find Flanigan's argument unpersuasive. In Grove v. Northeast Ohio NephrologyAssoc, Inc. (2005), 164 Ohio App.3d 829, 22585, 2005-Ohio-6914,844 N.E.2d 400, the Ninth District Court of Appeals addressed a similar issue, wherein the court refused to accept the appellee's argument that HIPAA preempted R.C. 2317.02 and allowed for discovery of privileged health information. There, the court found that HIPAA included an exception for state laws relating to the privacy of individually identifiable health information. The applicable provision, found in Section 160.203, Title 45, C.F.R., states:
 {¶ 75} "A standard, requirement, or implementation specification adopted under this subchapter that is contrary to a provision of State law preempts the provision of State law. This general rule applies, except if one or more of the following conditions is met:
 {¶ 76} "(b) the provision of State law relates to the privacy of individually identifiable health information and is more stringent than a standard, requirement, or implementation specification adopted under subpart E of part 164 of this subchapter." According to the court, the purpose of R.C. 2317.02(B) was to codify Ohio's physician-patient privilege and protect a patient's individually identifiable health information. Grove, 2005-Ohio-6914, at ]}22. Moreover, the court found the provisions of R.C. *Page 21 2317.02(B)(1)(a) and (b) to be more stringent than those of HIPAA. Id. at ?23. Therefore, R.C. 2317.02(B) clearly fits within the exception of Section 160.203, Title 45, C.F.R.
 {¶ 77} Here, in accordance with the Ninth District's interpretation of the relationship between HIPAA and R.C. 2317.02(B), we believe Flanigan's argument lacks merit. A plain reading of the federal Act shows that it does not preempt R.C. 2317.02(B) in this case, where Smith's records were clearly protected individualized identifiable health information. Furthermore, the record does not indicate that Smith, at any time, waived his privilege under R.C. 2317.02(B), thereby allowing the discovery of his medical information. Thus, we find that the trial court did not err in denying the defendant access to Ryan Smith's medical records. Accordingly, the fifth assignment of error is overruled.
 VI {¶ 78} Under his final assignment of error, Flanigan claims that the verdicts finding him guilty on two counts of aggravated vehicular homicide are against the sufficiency and manifest weight of the evidence.
 {¶ 79} "` "[Sufficiency" is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.'" State v. Thompkins (1997), 78 Ohio St.3d 380, 386,678 N.E.2d 541, citing Black's Law Dictionary (6th Ed.1990) 1433. The relevant inquiry when examining an appeal based on the sufficiency of the evidence is whether after viewing the evidence in a light most *Page 22 
favorable to the state, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.State v. Dennis (1997), 79 Ohio St.3d 421, 430, 683 N.E.2d 1096
(citations omitted). A guilty verdict will not be disturbed on appeal unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." Id.
 {¶ 80} On the other hand, when a conviction is challenged on appeal as being against the manifest weight of the evidence, an appellate court reviews the entire record, "`weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'"Thompkins, 78 Ohio St.3d at 387, quoting State v. Martin
(1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717. Essentially, a reviewing court "sits as a `thirteenth juror' and makes its own independent review of the evidence and inferences derived therefrom, and assesses and weighs the credibility of each witness's testimony." Hagel, Ohio's Criminal Practice and Procedure (2006-07) 796, Section 41.207. However, "[b]ecause the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness. Contrastingly, the decision as to which of several competing inferences, suggested by the evidence in the record, should be preferred, is a matter in which an appellate judge *Page 23 
is at least equally qualified, by reason and experience, to venture an opinion." State v. Lawson (Aug. 22, 1997), Montgomery App. No. 16288,1997 WL 476684, at *4. Only in exceptional circumstances should a judgment be reversed as being against the manifest weight of the evidence. State v. Parker, Montgomery App. No. 18926, 2002-Ohio-3920, at f70 (citation omitted).
 {¶ 81} In arguing that his conviction is against the sufficiency and manifest weight of the evidence, Flanigan first contends that the jury was misled by the prejudicial and inflammatory effect of the autopsy photographs of James Kruse and Riley Smith, in addition to the prejudicial inference of testimony concerning prior instances when Flanigan pulled up the emergency brake while driving his car. He also argues that the jury was not in the best position to determine the credibility of the witnesses because the trial court improperly excluded the civil deposition testimony of Ryan Smith. Having already found no error in the trial court's decisions regarding this evidence, we find no merit to Flanigan's argument here.
 {¶ 82} Furthermore, Flanigan claims that there is substantial evidence demonstrating that Ryan Smith was the driver of the car. In particular, Flanigan refers to (1 ) Annette Jarnigan's testimony stating that Smith told her "his friends made him drive" (Tr. at 863); (2) other conflicting testimony as to Smith's statements regarding his position in the vehicle, i.e., in the passenger seat and in the back seat (Tr. at 1309); (3) evidence that Smith had been drinking (Tr. at 585); and (4) inconsistencies among the I.D. witnesses at T. J. Chumps as to whether the driver of the car was wearing a baseball cap and a shirt.
 {¶ 83} On reviewing the record, we find the evidence sufficient to sustain *Page 24 
Flanigan's conviction for two counts of aggravated vehicular homicide. Although Annette Jarnigan testified that Smith told her he had been driving, her complete testimony was Smith said he wasn't driving, and then he said his friends made him drive, and "then he kept rattling on and on." (Tr. at 863.) She also provided that Smith appeared to be very confused and that she was not certain about what he was talking. Smith's confusion can reasonably be attributed to the accident having just occurred, for Jarnigan found him standing next to the wreckage, apparently moments after he had climbed out of the car. She eventually led him away from the accident and sat him down. Smith's confusion also may have contributed to his conflicting statements to Leah Brown, a volunteer for the German Township Rescue Squad. Brown testified that Sm ith told her first that he had been sitting in the backseat, and then he told her that he was sitting in the front passenger seat without a seat belt. Later, she stated on cross-examination that Smith appeared to be confused as to his position in the car, which is a common result among people involved in car accidents. In contrast, Officer Steven Marsden testified that upon encountering Smith and Jarnigan at the scene of the accident, Smith told him three times during a conversation that he had not been driving.
 {¶ 84} Next, the fact that Smith testified he had been drinking does not mean that the jury had to believe that he was the driver of the vehicle. The record provides ample evidence that the defendant had also been drinking that night. Rick Kruse testified that the defendant told him he and Riley Smith were "hitting it pretty hard" when asked by Kruse who had been drinking. (Tr. at 566.) Flanigan also told Kruse that he had bought the alcohol that night-a bottle of Riva Vodka, a 24-pack of Bud Lite bottles, and a 6-pack of Bud Ice bottles. Moreover, Smith testified that he saw Flanigan consume *Page 25 
approximately two or three Bud Ices, along with vodka and orange juice, while they were drinking at Kruse's house before they left for T.J. Chumps. At T.J. Chumps, all four boys drank more beer. Several of the I.D. witnesses at the bar testified that Flanigan appeared to be drunk, as he was shouting profanities, throwing bottles and punching cars in the parking lot.
 {¶ 85} We also find it reasonable for the jury to conclude that Flanigan was the driver of the car based on the I.D. witnesses' testimony. The common thread in all of their testimonies is that Flanigan was causing the disturbance at T.J. Chumps, and he got into the driver's side of the vehicle before leaving. In the parking lot, witnesses testified that they saw him revving the engine of his vehicle until smoke poured from it. When asked whether he needed assistance, Flanigan responded with "go fuck yourself, mind your own business." (Tr. at 767.) Furthermore, Flanigan was seen storming away from the door of the bar after being refused entry and yelling obscenities and pounding on cars in the parking lot. Chris Rice testified that he saw Flanigan get in the driver's seat of the car and pull away, as did Jennifer Berz and Greg Cordell. While an inconsistency exists as to whether he was wearing or had taken off his white t-shirt, the jury was in the best position to weigh the credibility of the witnesses and determine what actually occurred.
 {¶ 86} Finally, we believe there was sufficient testimonial evidence from the accident reconstructionist and other officials involved in determining the cause of the crash to reasonably support the jury verdict. Patrolman Edward Magoto, the accident reconstructionist, testified that the vehicle initially skidded off of the road due to someone pulling the emergency brake. Richard Dunn, a heavy-duty wrecker driver and *Page 26 
service driver for the towing company that transported the vehicle after the crash, confirmed that the emergency brake was in the full upright and fully applied position. At the time the emergency brake was pulled, the car was traveling a minimum speed of 72 miles per hour. Magoto further provided that the right rear of the car collided with a tree, sending the car in a clockwise rotation. The tires on the left then hit the front lip of the porch, causing the car to flip over, hit the ceiling of the porch, make contact with the front of the house, and come to rest upside down. According to Magoto, the rear of the vehicle was completely gone by the time the car landed on the porch. In light of this reconstruction, Magoto testified that it was his opinion as an expert in the case and as a crash reconstructionist that the two people ejected from the car, James Kruse and Riley Smith, had to be backseat passengers. He further stated, in contrast to the contention of the defendant, that it would not be possible for a backseat passenger to be propelled into the front seat because of the lack of forward momentum in this particular case.
 {¶ 87} Testimony and photographic evidence confirmed that Flanigan was trapped in the driver's seat. He had to be cut out after Miami Township Fire Department officials removed the driver's head rest. The record also demonstrates that the front passenger side sustained the least amount of damage, and Ryan Smith, the only occupant able to walk away from the accident, testified that he climbed out of the passenger seat.
 {¶ 88} In reviewing the entire record, we find that the evidence was more than sufficient to sustain the conviction for two counts of aggravated vehicular homicide. Likewise, we do not find that the judgment was against the manifest weight of the evidence. In weighing the evidence and all reasonable inferences, we do not find that *Page 27 
the jury "lost its way and created such a manifest miscarriage of justice that the conviction must be reversed." Thompkins,78 Ohio St.3d at 387 (citation omitted). Accordingly, Flanigan's sixth assignment of error is overruled.
 {¶ 89} Based on the foregoing discussion, assignments two, three, four, five and six are overruled, and the first assignment is sustained to the extent noted. The judgment of the trial court is reversed, and this matter is remanded for re-sentencing in accordance with State v.Foster, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470.
FAIN and VALEN, JJ., concur.
(Hon. Anthony Valen, retired from the 12th Appellate District, sitting by (assignment of the Chief Justice of the Supreme Court of Ohio) *Page 1