OPINION
{¶ 1} Defendant-appellant James A. Russell appeals from his conviction and sentence upon one count of Aggravated Robbery, one count of Murder (proximate result), one count of Tampering with Evidence, one count of Grand Theft of a Motor Vehicle, one count of Gross Abuse of a Corpse, and one count of Having Weapons while under Disability, together with *Page 2 
three-year firearm specifications for the Aggravated Robbery, Murder, and Grand Theft of a Motor Vehicle convictions. Russell contends that the trial court erred in not declaring a mistrial when it was discovered that a verdict form for the count of Having Weapons while under Disability, which was to be tried to the bench, had been sent into the jury room with the jury. We agree. For this reason, the judgment of the trial court is Reversed, and this cause is Remanded for further proceedings.
 {¶ 2} Russell also contends that the trial court committed plain error, and that his trial counsel was ineffective for having failed to object, when evidence that a key prosecution witness had agreed, as part of an agreement with the State, to take a polygraph examination, and that the entire agreement was contingent upon her passing that examination. We agree with Russell that this evidence should not have been admitted, prior jurisprudence from this court to the contrary notwithstanding. But we conclude that this error does not rise to the level of plain error, and that Russell's trial counsel was not ineffective for having failed to raise this issue.
 {¶ 3} Russell raises other issues that are rendered moot in view of our disposition of his First Assignment of Error.
 I {¶ 4} The facts relevant to this appeal are set forth in State v.Russell (Jan. 12, 2007), Montgomery App. No. 21458, 2007-Ohio-137, as follows:
 {¶ 5} "In the early morning hours of September 1, 2004, Philip Troutwine, a safety inspector for the Federal Aviation Administration, left his Darke County residence to go to work at the Dayton International Airport. When he did not return home by the evening of September *Page 3 
3, 2004, Troutwine's wife, Patti, contacted the Darke County Sheriff s Department to report him missing.
 {¶ 6} "On September 10, 2004, the Darke County Sheriffs Department received an anonymous tip from a female claiming that she had been given information concerning Troutwine's disappearance from a tenant of a small apartment complex at 2080 Auburn Avenue in Dayton, Ohio. In particular, the caller stated that she was told that Troutwine had been shot and killed after going to 2080 Auburn Avenue, Apartment 3, to visit a prostitute.
 {¶ 7} "Darke County Sheriffs Office Detective Sergeant Mark Whittaker then contacted the Dayton Police Department concerning the anonymous tip. On September 10, 2004, Whittaker, accompanied by Dayton Police Officers, traveled to 2080 Auburn Avenue and located the caretaker of the rental property, Chauncey King, who granted them access to the apartment. King testified at the motion to suppress that he told the police that Apartment 3 had been occupied by Russell and Candace Hargrove, but they had moved out and abandoned the apartment according to one of the other tenants at 2080 Auburn Avenue, Lisa Dillard. In fact, King testified that he had personally gone to the apartment previously and determined that it was abandoned after which he gave Dillard permission to enter the apartment and remove any items of furniture that had been left behind. Based on the statements made by King, Detective Whittaker and Dayton Police Officers entered the apartment and searched for evidence of a crime. Dayton Crime Scene Investigators discovered blood on a doorframe that was eventually determined to be Troutwine's blood.
 {¶ 8} "Approximately two weeks later on September 25, 2004, the body of Troutwine was discovered in the trunk of his car which was found parked in the parking lot of an apartment *Page 4 
complex in West Carrollton, Ohio. Troutwine had been shot once in the head and wrapped in plastic garbage bags and tent material.
 {¶ 9} "On October 25, 2004, Russell and Hargrove were removed from a bus in Los Angeles, California, and charged with the murder of Troutwine. The couple was extradited back to Ohio where, in exchange for a reduced sentence, Hargrove agreed to testify against Russell whom she stated had murdered Troutwine after attempting to rob him.
 {¶ 10} "Pursuant to her agreement with the State, Hargrove testified at trial that she and Russell were living together at 2080 Auburn Avenue, Apartment 3 at the time of the murder of Troutwine. Hargrove, an admitted prostitute who was six months pregnant when the murder occurred, testified that Troutwine had contacted her to arrange a meeting for sex. Hargrove further testified that on September 1, 2004, she spoke to Troutwine over the telephone and provided him with directions to her apartment at 2080 Auburn Avenue so that the two could engage in sexual intercourse for money.
 {¶ 11} "Records from the Dayton International Airport reveal that Troutwine arrived at work at 6:27a.m. on September 1, 2004, but left shortly thereafter at 8:27a.m., ostensibly so that he could meet with Hargrove at her residence. Hargrove testified that she had been out the entire night before and that she did not want to have sex with Troutwine. Instead, she and Russell, who was at the apartment, hatched a plan to rob Troutwine upon his arrival. Hargrove stated that she was going to lure Troutwine to the back of the apartment where Russell would then surprise Troutwine and rob him. Hargrove testified that she was unaware that Russell planned to use a gun in the commission of the crime.
 {¶ 12} "After Troutwine arrived, Hargrove let him in the apartment and began to lead *Page 5 
him to the bedroom at the rear of the apartment. While Hargrove and Troutwine were in the kitchen which adjoined the bedroom, Russell came out from his hiding place, pointed a gun at Troutwine, and told Hargrove to go back into the front room. Hargrove testified that she heard Russell demand money from Troutwine and then she heard a single shot from a firearm. Russell ran into the front room and told Hargrove that he did not mean to shoot Troutwine but that they now needed to dispose of the body and clean up the blood in the kitchen.
 {¶ 13} "Hargrove and Russell wrapped Troutwine's head and torso in a garbage bag to contain the blood. Russell then took Troutwine's car keys and pulled his vehicle around to the rear of the apartment building. Russell took a tent he had found outside and went back into the apartment. He and Hargrove wrapped the body in the tent and placed it in the trunk of Troutwine's vehicle. Hargrove went back to the apartment to change clothes while Russell drove the vehicle and parked it behind a vacant building. Russell returned to the apartment, and he and Hargrove began cleaning the kitchen where the shooting had taken place. One of Russell's friends came to the apartment and took Hargrove to buy additional cleaning supplies. After returning from the store, they finished cleaning the apartment and began making arrangements to leave. Hargrove packed suitcases for both she and Russell, and the couple walked to her cousin's residence nearby and placed the suitcases in the basement. Hargrove testified that she and Russell then retrieved Troutwine's car from behind the vacant building and drove it to the apartment complex in West Carrollton where it was located three weeks later.
 {¶ 14} "Hargrove and Russell returned to Dayton, but did not go back to the apartment at 2080 Auburn Avenue. Instead, the two stayed at Russell's sister's residence for a few days and then traveled to Louisville, Kentucky, after Russell's mother bought them bus tickets. *Page 6 
Hargrove and Russell left Louisville after approximately a week and traveled to Detroit, Michigan, where they stayed with Russell's cousins. The couple's final destination was Los Angeles, California, where they were arrested and eventually transported back to Dayton, Ohio, to stand trial in connection with the murder of Troutwine."
 {¶ 15} Russell was charged by indictment with one count of Aggravated Robbery, one count of Murder (proximate result), one count of Tampering with Evidence, one count of Grand Theft of a Motor Vehicle, one count of Gross Abuse of a Corpse, and one count of Having Weapons while under Disability. The Aggravated Robbery, Murder, and Grand Theft of a Motor Vehicle counts included firearm specifications.
 {¶ 16} The Having Weapons while under Disability count was tried to the bench, the remaining counts and specifications were tried to a jury. Russell was found guilty of all counts and specifications, and was sentenced accordingly. Russell appealed, but his convictions and sentence were affirmed in State v. Russell, supra.
 {¶ 17} Russell applied to re-open his appeal under App. R 26(B). We found his motion well-taken, and re-opened his appeal, which is now ripe for disposition.
 II {¶ 18} Russell's First Assignment of Error is as follows:
 {¶ 19} "THE COURT COMMITTED PREJUDICIAL ERROR WHEN IT OVERRULED MR. RUSSELL'S MOTION FOR A MISTRIAL, WITHOUT FIRST CONDUCTING AN INQUIRY, ON THE GROUNDS THAT THE VERDICT FORM FOR THE WEAPONS DISABILITY CHARGE WAS GIVEN TO THE JURY, DESPITE THE *Page 7 
COURT'S ASSURANCES UPON DEFENSE COUNSEL'S REQUEST THAT THE FORM NOT BE SUBMITTED TO THE JURY. THIS VIOLATED MR. RUSSELL'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL BY AN IMPARTIAL JURY BASED ONLY UPON THE EVIDENCE PRESENTED AT TRIAL, AS GUARANTEED BY THE DUE PROCESS CLAUSES OF THE OHIO AND UNITED STATES CONSTITUTIONS."
 {¶ 20} Russell contends that the trial court erred when it failed to grant his motion for mistrial after a blank verdict form for Count VI, Having a Weapon while under a Disability, was mistakenly provided to the jury. It had been agreed that Count VI was to be tried to the bench. Thus, no mention of Count VI should have been made to the jury. Russell argues that publishing the verdict form to the jury was prejudicial insofar as it improperly informed the jury that he "was facing a charge in addition to the charges it was deliberating." Russell asserts that this would have led to impermissible speculation by the jurors as to the nature of the present charge as well as the nature of the crime(s) he committed in the past in order to receive that designation. Russell argues that although the potential impact of the improper inclusion of the verdict form cannot be precisely measured, speculation by the jury could have prejudicially affected his credibility and tainted the outcome of the case.
 {¶ 21} Immediately prior to the jury being sent back to deliberate, defense counsel became aware that the verdict forms he had been provided with by the court mistakenly contained a form for Count VI, Having a Weapon while under a Disability. Defense counsel addressed the trial court regarding this mistake in the following exchange:
 {¶ 22} "Defense Counsel: The only question that I had was that, uh . . . — that the particular package I have shows a, uh . . . Count VI.You will not send that back? *Page 8 
 {¶ 23} "The Court: It will not. It will not go back. No, that was just. . .
 {¶ 24} "Defense Counsel: Yeah.
 {¶ 25} "The Court: . . . printed out because we originally had it."
 {¶ 26} After approximately ninety minutes of deliberations, the jury returned the Count VI verdict form, which the trial court had inadvertently provided to them. Although the jurors apparently decided to leave the form for Count VI blank, the form was nevertheless published to the jurors, despite the assurance of the court that it would not be. After the court became aware of this, it called a conference with the parties, in which the following exchange occurred:
 {¶ 27} "The Court: * * * But I did want to relate and indicate that at about — I would say an hour or an hour-and-a-half into deliberations, they took a lunch break. They went out about 12:30. They took a lunch break; they came back at about 1:30. And about an hour or an hour-and-a-half into deliberations, they buzzed and they gave the Verdict, this form that I will mark as Court Exhibit Roman Numeral Number III, which was a Verdict on Count VI. But all it says is: `Verdict Count VI. Upon the issues joined, the Court find[s] the Defendant, James A. Russell, blank, of Having Weapon Under Disability as charged in the Indictment.'
 {¶ 28} "It doesn't say any further what that disability is; it doesn't say what the offense was that might have caused the disability and does describe disability.[1]
 {¶ 29} "That being the case, is there any — I'm gonna make that part of the record. Is there any Motions . . . discussions or requests on behalf of the State with regard to that particular *Page 9 
item that the jury submitted back to the Bailiff?
 {¶ 30} "And I can relate that what the Bailiff indicated, for the record, was they didn't know what this was and they gave it to him and he said he'd take care of it.
 {¶ 31} "Anything on behalf of the State?
 {¶ 32} "The State: * * * Judge, do you — do you have any idea how long they — they had that document in there? Was it two . . .
 {¶ 33} "The Court: From the time that they began deliberating until they gave it to the Bailiff is when they would have had it in there.
 {¶ 34} "The State: But it was at the bottom, right?
 {¶ 35} "The Court: It was at the. . .
 {¶ 36} "Defense Counsel: It was at the bottom?
 {¶ 37} "The Court: . . . very bottom.
 {¶ 38} * * *
 {¶ 39} "The State: And there was no note or anything to it or anything?
 {¶ 40} "The Court: Nothing. Nothing other than that one piece of paper that I'm marking.
 {¶ 41} * * *
 {¶ 42} "The State: And there was no indication that that — I mean, they didn't say anything about that affecting any kind of deliberations or anything like that?
 {¶ 43} "The Court: Nothing.
 {¶ 44} "The State: * * * I'm not sure that an abundance of caution if the Jury should be asked what, if any influence, if any, this might have had on their Verdict. *Page 10 
 {¶ 45} "Uh. .so, maybe there's a record made that — again, I don't wanna highlight this, but, uh . . . , uh . . . don't know if there should maybe, uh . . . — just maybe explain this — the document had nothing to do with — there was inadvertently — did it affect anyone in your deliberations? Then maybe have to inquire so there's a record made if the Court of Appeals is gonna wonder that question. I think there's a record made when the Jury's here now before they're discharged.
 {¶ 46} "The Court: Okay. Any input on behalf of the defense?
 {¶ 47} "Defense Counsel: I don't think you can inquire of Jurors the basis for their decisions in regard to the Verdict.
 {¶ 48} "The Court: And I'm not sure that you can either after the Verdict. That's. . . . .
 {¶ 49} "The State: Mmm Hmm.
 {¶ 50} "The Court: I would hesitate. . .
 {¶ 51} "Defense Counsel: After the Verdict, I think. . . .
 {¶ 52} "The Court: . . . to do anything prior to the Verdict, because prior to the Verdict we're liable to interfere with whatever decision they have already made.
 {¶ 53} "The State: Right.
 {¶ 54} "Defense Counsel: But I think it's — from Defense point of view, in order to protect the — the record, I have to issue an objection to, uh, . . . the proceedings, especially since the Court and, uh . . . State on notice at the end of the Jury Instructions about that specific document.
 {¶ 55} "The Court: Say that again. At the end of the. . .
 {¶ 56} "Defense Counsel: When we met at the Side Bar after. . .
 {¶ 57} "The Court: Right. *Page 11 
 {¶ 58} "Defense Counsel: . . . finishing Instructions, I specificallyasked that this not — this particular verdict form not besubmitted.
 {¶ 59} "The Court: Was it in that form already or the expanded form?
 {¶ 60} "Defense Counsel: It was in this form.
 {¶ 61} "The Court: Okay.
 {¶ 62} "Defense Counsel: And, uh . . . — of course it was stapled together and I was told that that's — you know, that's the complete package, that's for our benefit not for the Jury. But it went back tothe Jury anyway.
 {¶ 63} "The State: I'm a — a little confused. What do you — what do you want — what is your opinion of what should be done? Nothing at this point?
 {¶ 64} "Defense Counsel: I don't think you can do anything.
 {¶ 65} * * *
 {¶ 66} "Defense Counsel: `Cause I think the only thing that, uh . . . — that's open for us is for me to ask for a mistrial.
 {¶ 67} "The Court: And the response to that is?
 {¶ 68} "The State: Oh, we would oppose a mistrial at this time. I mean, that. . .
 {¶ 69} "The Court: And the basis of a mistrial is what? Other than the fact this piece of paper went back there. Anything unique or specific or any argument on that issue?
 {¶ 70} "Defense Counsel: Well, the, uh . . . — for whatever prejudicial impact it has of showing another, uh . . . Count.
 {¶ 71} "We can only speculate how it may have, uh . . . impacted the Jury.
 {¶ 72} "The State: And they could've thought it was a typo and. . . *Page 12 
 {¶ 73} * * *
 {¶ 74} "The State: . . . didn't mean anything also. I mean, there's really not too much information on there. There's no other additional facts. A weapon, they know he's charged with a weapon. There's really not too much information on there.
 {¶ 75} "The State: It's not a crime, too, that most people know of. I mean, it's. . . .
 {¶ 76} "The Court: Well, the Court's gonna conclude that this is not a [sic] error that works to the prejudice of the Defendant. That he was, in fact, charged with another offense. This does not indicate anything other than Having Weapons Under Disability. There's already a charge and there's Firearm Specifications, so the weapons' issue is already before the Jury.
 {¶ 77} "There's no definition of what in the world disability means and the Jury could very easily conclude and indicated to the Bailiff: `What is this?' And he said he'll take of it. So, I'm gonna — I'm gonna proceed on.
 {¶ 78} "I'll make this part of the record and indicate that — I know the way that this happened is because we did have originally all of the Jury Instructions for all of the charges prepared last week and when Monday came around and we. . .
 {¶ 79} * * *
 {¶ 80} "The Court: . . . Count Number VI was tried to the Court, that Verdict Form, at least in the modified form, was left in there.
 {¶ 81} "In any event, we're gonna proceed on. I'll overrule your Motion."
 {¶ 82} A trial court is entitled to some deference in ruling upon a motion for a mistrial, in recognition of the fact that the trial judge is in the best position to determine whether the situation in his or her courtroom warrants the declaration of a mistrial. State v. Glover
(1988), *Page 13 35 Ohio St.3d 18, 19, 517 N.E.2d 900. The above-quoted exchange demonstrates that the trial court was aware of the error in providing the jury with the verdict form for Count VI. Moreover, as defense counsel correctly pointed out, we can only speculate as to how the mistaken inclusion of the verdict form impacted the jury. It is possible that the jury may have completely disregarded the document. But it is also possible that the jury could have concluded that the word "disability," as used in the verdict form, referred to a prior conviction in which Russell used a weapon. If the jury were to reach the latter conclusion, that knowledge would be highly prejudicial to Russell in deliberations. Obviously, defense counsel had sought to reduce any such prejudice by trying Count VI to the court. We cannot gauge with any reliability the effect, if any, that publishing the verdict form for Count VI had on the jury. If we cannot perform that task with the requisite reliability that this inquiry demands, then neither could the trial court. We conclude, therefore, that it was prejudicial error for the verdict form for Count VI to be published to the jury. We further conclude that it was an abuse of discretion for the trial court to overrule defense counsel's motion for a mistrial, in light of the potentially highly prejudicial impact of the publication of the existence of Count VI.
 {¶ 83} Russell's First Assignment of Error is sustained.
 III {¶ 84} Russell's Second Assignment of Error is as follows:
 {¶ 85} "THE STATE COMMITTED PROSECUTORIAL MISCONDUCT WHEN IT IMPROPERLY BOLSTERED THE CREDIBILITY OF ITS KEY WITNESS, C ANDACE HARGROVE, BY ELICITING TESTIMONY FROM HER REGARDING HER AGREEMENT *Page 14 
TO TAKE A POLYGRAPH EXAMINATION AS PART OF HER PLEA AGREEMENT. THIS IMPROPER QUESTIONING VIOLATED MR. RUSSELL'S RIGHTS TO AND A FUNDAMENTALLY FAIR TRIAL UNDER THE DUE PROCESS CLAUSES OF THE OHIO AND UNITED STATES CONSTITUTIONS."
 {¶ 86} Russell contends that the State committed prosecutorial misconduct by eliciting testimony from its key witness, Candace Hargrove, regarding a portion of her plea agreement that required her to submit to a polygraph examination if asked to do so by the State. Russell maintains that the State's mention of the polygraph examination in the presence of the jury was an intentional and improper attempt to bolster the credibility of Hargrove, and is, therefore, prejudicial error. Additionally, State's Exhibit 81, the actual document memorializing the plea agreement, repeatedly mentions that Hargrove may be required by the State to take a polygraph test. Although not mentioned by Russell in his merit brief, this document was provided to the jury without objection during their deliberations and further supports Russell's argument.
 A. The Admissibility of an Agreement by a Witness to Take a Polygraph Examination. {¶ 87} As a general rule, results of polygraph tests are not admissible to prove the guilt or innocence of the accused because such tests have not been recognized by the scientific community as being a reliable method for determining the veracity of the examinee. State v.Rowe (1990), 68 Ohio App.3d 595, 609; State v. Hegel (1964),9 Ohio App.2d 12, 13. Pursuant to this general rule, some courts have also held that, in addition to the results of a polygraph test, testimony expressing either the willingness or the refusal to submit to a polygraph examination should not be admitted in evidence. *Page 15 Hegel, 9 Ohio App.2d at 13; State v. Smith (1960), 113 Ohio App. 461,463-65. However, polygraph test results may be admissible for the purposes of corroboration or impeachment, providing that the conditions set forth in State v. Souel (1978), 53 Ohio St.2d 123, 132, are strictly followed. See Rowe, 68 Ohio App.3d at 609-10; State v. Lascola (1988),61 Ohio App.3d 228, 234-36.
 {¶ 88} At the beginning of the trial, the following exchange was initiated by the State while questioning Hargrove:
 {¶ 89} "Q: Tell the jury what you agree to do.
 {¶ 90} "A: Testify.
 {¶ 91} "Q: Testify here in Court or any proceedings on the case involving-anything involving the death or disappearance of Philip Troutwine?
 {¶ 92} "A: Yes.
 {¶ 93} "Q: And you agreed to cooperate with law enforcement officials.
 {¶ 94} "A: Yes.
 {¶ 95} "Q: And you also agreed to come in and testify?
 {¶ 96} "A: Yes.
 {¶ 97} "Q: At the request of the Prosecutor, uh . . . would you haveto submit to a polygraph examination, if required?
 {¶ 98} "A: Yes, I would.
 {¶ 99} "Q: And also, in the event that the State felt that you werenot being truthful, can this, uh . . . Agreement be withdrawn and you besubjected to those other charges?
 {¶ 100} "A: Yes, it can." (Emphasis added). *Page 16 
 {¶ 101} State's Exhibit 81, Hargrove's plea agreement, which was provided to the jury during deliberations without objection, states in pertinent part:
 {¶ 102} "In exchange for these considerations, the Defendant [Hargrove] agrees to the following:
 {¶ 103} "(1) Candace N. Hargrove hereby agrees to cooperate with the Prosecuting Attorney and all other law enforcement authorities, by answering their questions truthfully during all such interviews and by testifying truthfully as to all matters asked of her whenever she is called to give testimony in legal proceedings, including but not limited to proceedings involving any and all co-defendants.
 {¶ 104} "(2) Upon request of the Prosecuting Attorney, Candace N.Hargrove will submit to polygraph examinations administered andconducted by polygraph examiners selected by the ProsecutingAttorney, upon questions and matters determined by the Prosecuting Attorney.
 {¶ 105} "(3) In the event that the Prosecuting Attorney has reasonable grounds to believe that Candace N. Hargrove answers questions of the Prosecuting Attorney or law enforcement authorities falsely, testifies falsely, is deceptive in polygraph examinations, or fails or refuses to testify when called to do so, the Prosecuting Attorney may nullify this agreement. The State of Ohio may then initiate any prosecution against against Candace N. Hargrove as deemed appropriate by the Montgomery County Prosecutor's Office concerning the events and circumstances pertaining to the death of Philip Troutwine and related offenses. * * *" (Emphasis added.)
 {¶ 106} The test for prosecutorial misconduct is whether the remarks are *Page 17 
improper and, if so, whether they prejudicially affected the accused's substantial rights. State v. Smith (1984), 14 Ohio St.3d 13, 14-15,470 N.E.2d 883. The touchstone of the analysis "is the fairness of the trial, not the culpability of the prosecutor." Smith v. Phillips (1982),455 U.S. 209, 219, 102 S.Ct. 940.
 {¶ 107} Initially, it should be noted that the State argues that we have held in a number of cases that it is permissible for the prosecution to ask one of its witnesses whether he or she agreed to submit to a polygraph examination as part of a negotiated plea deal, citing: State v. Schlosser (May 24, 1996), Montgomery App. No. 14976, 14968; State v. Ballard (Nov. 22, 1996), Montgomery App. No. 15410;State v. Perry (Nov. 25, 1998), Miami App. No. 97CA61, 98CA5; andState v. Scott (August 4, 2006), Montgomery App. No. 21260,2006-Ohio-4016.
 {¶ 108} In Schlosser, defense counsel filed a motion in limine seeking to redact a portion of a cooperation agreement drafted by the State which required the witness to potentially submit to a polygraph examination. In affirming the trial court's decision to admit the cooperation agreement in toto, we held that since "no results of the of any polygraph test were admitted during trial or even proffered, the standards set forth by the Ohio Supreme Court in State v. Souel (1978),53 Ohio St.2d 123, 372 N.E.2d 1318, for the admission of such evidence were not applicable for this situation. We see no abuse of discretion on the part of the trial court in admitting evidence which reflected a witness' mere willingness to take such an examination."Schlosser (May 24, 1996), Montgomery App. No. 14976, 14968, reversed on other grounds, (1997), 79 Ohio St.3d 329, 681 N.E.2d 911. Other than this conclusory assertion, we provided no further explanation or rationale supporting the admission of evidence *Page 18 
demonstrating that a witness could testify to his or her willingness to submit to a polygraph examination.
 {¶ 109} In Ballard, the prosecution did not specifically ask the witness whether he had agreed to a polygraph test. In outlining the terms of his plea agreement, the witness testified that one of the requirements was that he may have to submit to a polygraph examination. Defense counsel immediately requested a mistrial. The trial court denied the motion, but offered a curative instruction to the jury directing them to disregard any reference to the polygraph examination. We held that the thorough instruction given by the trial court to the jury immediately after denying defendant's motion for mistrial cured any improper effect resulting from the witness' reference to his willingness to take a polygraph examination. Ballard, supra.
 {¶ 110} But in Ballard we also opined that the Ohio Supreme Court inState v. Spirko (1991), 59 Ohio St.3d 1, 570 N.E.2d 229, implicitly rejected the "notion that testimony regarding the willingness or refusal to take a polygraph examination should not be admitted into evidence." In Spirko, the Supreme Court held that any error in admitting the testimony of a State's witness that the defendant had told the witness that he had failed a polygraph test and that the witness had taken a polygraph test were not grounds for reversal where defense counsel made no objection when the allegedly prejudicial statements were made, the statement that the witness had passed the examination was elicited by defense counsel, no curative instruction was requested by defense counsel, and no polygraph examination results were admitted during trial. The court additionally stated that the trial court was not required to follow the procedure for admission of polygraph test results established in Souel in admitting the *Page 19 
testimony of a State's witness that he had asked the defendant if he would be willing to submit to a polygraph examination when no results from any polygraph test taken by the defendant were admitted during trial. Spirko did not hold that it is permissible for the State to ask a prosecution witness whether he or she has agreed to submit to a polygraph examination as part of a negotiated plea deal.
 {¶ 111} In State v. Perry, supra, a State's witness testified that the defendant had informed him that he had offered to take a polygraph test, but his offer had been refused by authorities. Defense counsel immediately moved for a mistrial, which was subsequently denied by the court. We held that the trial court did not abuse its discretion when it admitted evidence with respect to a defendant's willingness to submit to a polygraph test. We also held that the defendant waived any right to claim prejudice because of the admission of his willingness to take a polygraph test, since defense counsel remarked during closing arguments that the defendant's willingness to submit to a polygraph examination was evidence of his innocence. We also noted in the decision that the admission of this evidence necessarily invites a jury to speculate about whether a test was taken and what the results were. Such issues are "too remote from competent evidence to reasonably and fairly be probative of guilt or innocence." Perry, supra.
 {¶ 112} In State v. Scott, supra, the defendant was convicted of one count of Gross Sexual Imposition. On appeal, he argued in his second assignment of error that the trial court erred in denying him the opportunity to cross-examine a detective with respect to his (the defendant's) willingness to submit to a polygraph examination. In concluding that the trial court did not abuse its discretion in disallowing the *Page 20 
defendant from eliciting testimony concerning his own willingness to take a polygraph, we held that a trial court has the discretion to deny the admission of evidence concerning the willingness of an individual to take a polygraph test.
 {¶ 113} We conclude that the State has correctly cited at least some of the cases noted above for the proposition asserted. In State v.Ballard, supra, at page 12, for example, we said: "This court has previously permitted the admission of testimony reflecting a witness' willingness to take a polygraph examination." We cited State v.Schlosser, supra, for this proposition, and in that case, at pages 38-39, we did, indeed, uphold the admissibility of evidence of a cooperation agreement that specifically included, over the defendant's objection, a reference to the witness's willingness to take a polygraph examination.
 {¶ 114} We conclude that we were wrong in holding that a witness's willingness to take a polygraph examination may properly be admitted in evidence over objection. In reaching this conclusion, the members of this appellate panel are unanimous.
 {¶ 115} In State v. Scott, supra, we cited State v. Jackson (1991),57 Ohio St.3d 29, 565 N.E.2d 549, which included the following holding:
 {¶ 116} "The subject of polygraph examinations is complex, confusing to the jury, and not relevant to the issues at trial. Even if Jackson had successfully taken a polygraph examination, the trial court could refuse to admit this evidence. Although polygraph examination results may be admitted for corroboration or impeachment, the parties must first jointly stipulate admissibility and follow certain explicit conditions [pursuant to Souel]. If polygraph examination results were notadmissible, the trial *Page 21 judge had no reason to allow Jackson's asserted offer into evidence.Id. at 36-37" (Emphasis added.)
 {¶ 117} The prosecutor, in this case, laid before the jury the fact that its witness agreed, as part of an agreement with the State for favorable treatment with regard to criminal charges pending against the witness, to take a polygraph examination, and further laid before the jury that the agreement with its witness was subject to the condition that any indication of evasion on the part of the witness would void the agreement.
 {¶ 118} An attorney may not express a personal belief or opinion as to the credibility of a witness. State v. Smith (1984), 14 Ohio St. 3d 13,14. The clear implication of the fact that a witness is present in court and testifying pursuant to an agreement with the State similar to the one in this case is that the witness was not found by the polygraph examiner to have been evasive, otherwise, the agreement would have been voided. By clear implication, the prosecutor in this case informed the jury that she was vouching for Hargrove's credibility because she wouldn't have put Hargrove on the witness stand if Hargrove had not taken, and passed, the polygraph examination. The fact that this vouching was predicated on Hargrove's testimony having been vetted by a polygraph examination does not ameliorate, but compounds the error, because it combines the improper vouching of the witness with an improper implication that the vouching is based upon the witness having passed a polygraph examination.
 {¶ 119} We conclude that it was improper for the State to have elicited from its witness, Hargrove, that she had agreed to take a polygraph examination, and *Page 22 
that her agreement with the State was contingent upon passing that examination. To the extent that our prior jurisprudence is inconsistent with this conclusion, we disapprove of that jurisprudence, and hereby signal our unwillingness to follow it in future cases.
 {¶ 120} "B. Whether the Admission of this Evidence Amounted to Plain Error.
 {¶ 121} Hargrove's testimony was allowed in without any objection from defense counsel, and Hargrove's plea agreement was provided to the jury during deliberations with no objection from defense counsel. Thus, we must review this assignment under a plain error analysis. Crim. R. 52(B) allows for a reviewing court to consider errors committed at trial, upon which appellant did not object, only if those errors affected the substantial rights of the appellant. A reviewing court should use the utmost caution in taking notice of plain error and should do so only if it is clear that, but for the error, the result in the trial court would have been different. State v. Smith (April 28, 2006), Greene App. No. 2005CA70, 2006-Ohio-2132; citing State v. Long (1978), 53 Ohio St.2d 91,372 N.E.2d 804, ¶ 2 of the syllabus. Notice of plain error should be taken only in exceptional circumstances and only to prevent a manifest miscarriage of justice. Id., ¶ 3 of the syllabus.
 {¶ 122} We cannot say that the result in this case would clearly have been otherwise had the evidence of Hargrove's agreement to take a polygraph exam not been admitted. Although Hargrove was the key witness for the State, she was not the only witness who testified to Russell's involvment. Cory Dillard and Danielle Richardson also testified that they saw Russell, along with Hargrove, carrying a bulky *Page 23 
object out and putting it in the trunk of a car, after having heard a gunshot. Furthermore, we cannot totally discount the possibility that the jury might have found Hargrove to have been a credible witness even without the testimony of her willingness to take a polygraph examination.
 C. Whether the Failure to Object to the Admission of Evidence Concerning Hargrove's Willingness to Take a Polygraph Examination Amounted to Ineffective Assistance of Counsel. {¶ 123} Russell's Fifth Assignment of Error is as follows:
 {¶ 124} "MR. RUSSELL'S TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE BY FAILING TO OBJECT TO (AND/OR TO REQUEST A CURATIVE INSTRUCTION REGARDING): 1) THE PROSECUTORIAL MISCONDUCT INVOLVED IN ELICITINGCANDACE HARGROVE'S TESTIMONY REGARDING HER WILLINGNESS TO SUBMIT TO APOLYGRAPH EXAMINATION; 2) HARGROVE'S POLYGRAPH EXAMINATION TESTIMONY,BASED UPON EVID. R. 403(B); 3) THE IMPOSITION OF MAXIMUM AND CONSECUTIVE SENTENCES BASED UPON JUDICIAL FACT-FINDING; AND 4) THE IMPOSITION OF RESTITUTION IN THE AMOUNT OF $15,498.25 WITHOUT THE COURT'S FIRST CONSIDERING THE [DEFENDANT'S] ABILITY TO PAY. THIS DEFICIENT PERFORMANCE VIOLATED MR. RUSSELL'S RIGHTS TO COUNSEL AND TO DUE PROCESS UNDER THE OHIO AND UNITED STATES CONSTITUTIONS." (Emphasis added.)
 {¶ 125} In the emphasized portion of this assignment of error, Russell argues that his trial counsel was ineffective for having failed to object to the State's *Page 24 
misconduct in eliciting testimony from Hargrove pertaining to the portion of her plea agreement which required her to submit to a polygraph examination if asked to do so by the State. Russell further asserts that his trial counsel's performance was deficient for having failed to object to the admission of Hargrove's polygraph testimony pursuant to Evid. R. 403(B).
 {¶ 126} "When considering an allegation of ineffective assistance of counsel, a two-step process is usually employed. First, there must be a determination as to whether there has been a substantial violation of any of defense counsel's essential duties to his client. Next, and analytically separate from the question of whether defendant'sSixth Amendment rights were violated, there must be a determination as to whether the defense was prejudiced by counsel's ineffectiveness."State v. Bradley (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, citingState v. Lytle (1976), 48 Ohio St.2d 391, 396-397, 358 N.E.2d 623, 627, vacated in part on other grounds (1978), 438 U.S. 910, 98 S.Ct. 3135.
 {¶ 127} The above standard contains essentially the same requirements as the standard set forth by the United States Supreme Court inStrickland v. Washington (1984), 466 U.S. 668, 104 S.Ct. 2052. "When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness." Strickland, supra, at 687-688. "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."Id. Thus, counsel's performance will not be deemed ineffective unless and until counsel's performance is *Page 25 
proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance. Id.
 {¶ 128} We have noted, in Part III-A, above, the prior cases decided by this court wherein we have approved the practice of eliciting testimony that a witness has agreed to take a polygraph examination.State v. Schlosser, supra; State v. Ballard, supra; State v. Perry, supra; and State v. Scott, supra. In view of this existing jurisprudence, and in view of the strong presumption that trial counsel's conduct falls within the wide range of reasonable professional assistance, we are not prepared to hold that Russell's trial counsel was ineffective for having failed to raise this argument in the trial court.
 {¶ 129} Because we conclude that the error assigned does not rise to the level of plain error, Russell's Second Assignment of Error is overruled. And because we conclude that Russell's trial counsel's conduct did not rise to the level of ineffective assistance of counsel, that part of his Fifth Assignment of Error asserting that his trial counsel was ineffective for not having raised the polygraph issue is overruled.
 {¶ 130} In reaching these conclusions, however, we are mindful that every member of this panel is in agreement that the State should not have been permitted, had a proper objection been made, to have elicited the evidence concerning Hargrove's willingness to take a polygraph examination. Therefore, upon remand, the trial court should not allow the admission of this evidence.
 IV {¶ 131} Russell's Third and Fourth assignments of error are as follows: *Page 26 
 {¶ 132} "WHEN IT SENTENCED MR. RUSSELL TO MAXIMUM AND CONSECUTIVE PRISON TERMS BASED UPON JUDICIAL FACT-FINDING, THE TRIAL COURT VIOLATED MR. RUSSELL'S RIGHTS GUARANTEED BY THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION.
 {¶ 133} "WHEN THE TRIAL COURT IMPOSED RESTITUTION IN THE AMOUNT OF $15,498.25 WITHOUT FIRST CONSIDERING MR. RUSSELL'S PRESENT OR FUTURE ABILITY TO PAY, IT VIOLATED MR. RUSSELL'S RIGHTS UNDER R.C.2929.19(B)(6) AND HIS RIGHTS TO DUE PROCESS UNDER THE OHIO AND UNITED STATES CONSTITUTIONS."
 {¶ 134} In view of our disposition of Russell's First Assignment of Error, these assignments of error, as well as that portion of Russell's Fifth Assignment of Error not having to do with his trial counsel's failure to have objected to the admission of evidence concerning Hargrove's willingness to take a polygraph examination, are overruled as moot.
 V {¶ 135} Russell's First Assignment of Error having been sustained, the judgment of the trial court is Reversed, and this cause is Remanded for further proceedings consistent with this opinion.
Brogan and Donovan, JJ., concur.
[1] It appears from the record that the court misspoke. The term "disability," while mentioned on the verdict form was neither defined nor described anywhere in that document. Moreover, the verdict form for Count VI did not reveal the underlying offense upon which the charge for having a weapon while under disability was predicated. *Page 1