OPINION
{¶ 1} Defendant, Aaron Whitfield, appeals from his conviction and sentence for aggravated murder and aggravated robbery.
 {¶ 2} Defendant Whitfield, along with Alexandre Pendergrass, Anthony Dominick and Otis Smith, devised a scheme to rob a Dayton clothing store, Nasru Fashions, located at *Page 2 
1937 N. Main Street. Defendant selected Nasru Fashions as the target for the robbery.
 {¶ 3} On September 30, 2004, Defendant and Smith entered the store and began looking at merchandise in the rear of the store in an effort to distract the store's owner, Mamadou Njie. Pendergrass then entered the store and pulled a gun on Mr. Njie. Pendergrass ordered Njie to lie down on the floor. Instead, Njie charged at Pendergrass, which prompted Pendergrass to fire his gun. Defendant and Smith were then in the rear of the store, taking merchandise.
 {¶ 4} When Njie rushed Pendergrass, Pendergrass fired several shots at Njie. Defendant then ran out of the store. Njie continued struggling with Pendergrass over the gun, and Pendergrass called for Smith to help him. Smith punched Njie in the head, and then he and Pendergrass ran out of the store.
 {¶ 5} When the four men met up at a nearby house, Pendergrass and Smith refused to give Defendant his share of the stolen merchandise because he had run from the store during the robbery. Njie subsequently died from the gunshot wounds he received during the robbery.
 {¶ 6} Defendant was indicted on one count of aggravated murder, R.C. 2903.01(B), and one count of aggravated robbery, R.C. 2911.01(A)(1). A three year firearm specification, *Page 3 
R.C. 2941.145, was attached to each charge. Following a jury trial, Defendant was found guilty of all charges and specifications. The trial court sentenced Defendant to concurrent prison terms of life imprisonment with parole eligibility after twenty years on the aggravated murder charge, and five years on the aggravated robbery charge. The court merged the two firearm specifications and imposed one additional and consecutive three year prison term on those. Finally, the court ordered Defendant to pay five hundred dollars in restitution to Njie's widow.
 {¶ 7} Defendant timely appealed to this court from his conviction and sentence.
FIRST ASSIGNMENT OF ERROR
 {¶ 8} "AARON WHITFIELD WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND ARTICLE I SECTION 10 OF THE OHIO CONSTITUTION."
 {¶ 9} Counsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance. Strickland v. Washington (1984),466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. To show that a *Page 4 
defendant has been prejudiced by counsel's deficient performance, the defendant must demonstrate that were it not for counsel's errors, there is a reasonable probability that the result of the trial would have been different. Id., State v. Bradley (1989), 42 Ohio St.3d 136.
 {¶ 10} Defendant argues that his counsel's performance was deficient in several respects. First, Defendant claims that his counsel performed deficiently by failing to object to the prosecutor's statements in closing argument, suggesting that Defendant did not have to harbor in his own mind a purpose or intent to cause Njie's death in order to be guilty of aggravated murder as an aider and abettor, and that the necessary purpose to cause death for aggravated murder could be imputed to Defendant from the intent of the actual shooter, Pendergrass.
 {¶ 11} The test for prosecutorial misconduct is whether the prosecutor's remarks were improper and, if so, whether they prejudicially affected substantial rights of the accused. State v.Bey, 85 Ohio St.3d 487, 493, 1999-Ohio-283. The focus of that inquiry is on the fairness of the trial, not the culpability of the prosecutor.Id.
 {¶ 12} Generally, prosecutors are entitled to considerable latitude in opening and closing arguments. Maggio v. Cleveland (1949),151 Ohio St. 136; State v. Ballew, *Page 5 76 Ohio St.3d 244, 1996-Ohio-81. A prosecutor may freely comment in closing argument on what the evidence has shown and what reasonable inferences the prosecutor believes may be drawn therefrom. State v. Lott (1990),51 Ohio St.3d 160, 165. In determining whether the prosecutor's remarks were prejudicial, the State's argument must be viewed in its entirety.Ballew, supra.
 {¶ 13} A "purpose to cause death" while committing or attempting to commit aggravated robbery is an essential element of the crime of aggravated murder per R.C. 2903.01(B), which the State must prove beyond a reasonable doubt, even if it proceeds on an aider/abettor theory.Clark v. Jago (CA 6, 1982), 676 F.2d 1099, 1104; State v. Scott (1980),61 Ohio St.2d 155; State v. Seiber (1990), 56 Ohio St.3d 4. A defendant aids and abets the commission of a crime when he advises, supports, assists, encourages or cooperates with the principal offender, and shares the criminal intent of the principal offender. R.C. 2923.03(A)(2); State v. Johnson, 93 Ohio St.3d 240, 2001-Ohio-1336. Such intent may be inferred from the facts and circumstances surrounding the crime. Id. A person is presumed to intend the natural, reasonable, and probable consequences of his actions. Seiber, at 13-14. An aider/abettor may be prosecuted and punished the same as the principal offender. R.C. 2923.03(F). *Page 6 
 {¶ 14} In State v. Lockett (1976), 49 Ohio St.2d 48, reversed on other grounds, Lockett v. Ohio (1978), 438 U.S. 586, 98 S.Ct. 2954,57 L.Ed.2d 973, the Ohio Supreme Court held in paragraphs three and four of the syllabus:
 {¶ 15} "3. Where the record in a prosecution for aggravated murder committed during the commission of an armed robbery establishes that the participants in the offense entered into a common design to commit the armed robbery by the use of force, violence and a deadly weapon and all the participants were aware that an inherently dangerous instrumentality was to be employed to accomplish the felonious purpose, a homicide occurring during the commission of the felony is a natural and probable consequence of the common plan which must be presumed to have been intended, and such evidence is sufficient to allow a jury to find a purposeful intent to kill.
 {¶ 16} "4. If a conspired robbery, and the manner of its accomplishment, would be reasonably likely to produce death, each person engaged in the common design to commit the robbery is guilty with the principal killer as an aider and abettor in the homicide although not actually present at the time of the homicide, and a purposeful intent to kill by the aider and abettor may be found to exist beyond a reasonable doubt under such circumstances." *Page 7 
 {¶ 17} In State v. Scott (1980), 61 Ohio St.2d 155, the Ohio Supreme Court explained that paragraphs three and four of the syllabus inLockett describe a factual basis from which a jury could make a permissive inference of a defendant's purpose to kill.
 {¶ 18} Defendant complains that certain statements made by the prosecutor during closing argument relieved the State of its burden of proving Defendant's purpose or specific intent to kill Njie, because those statements indicated that purpose to cause death could be imputed to Defendant from the actual shooter or any of the other accomplices who had that specific intent. Examining the closing arguments in their entirety, we agree that there are a few isolated statements by the prosecutor that were incorrect. For example, at one point the prosecutor said:
 {¶ 19} "Again, when the Judge charges you, he's going to tell you, and the language will say something about you have to believe that in the Defendant's mind there existed a specific purpose to kill. Well, that is in conjunction with aiding and abetting because the instruction will also say that if you see him as an aider and abettor and any one of those individuals had that specific intention, then all four of them have it. So, don't get confused by that language. *Page 8 
 {¶ 20} "If you believe he was an aider and abettor in the aggravated robbery, then he was an aider and abettor in the aggravated murder."
 {¶ 21} These statements are incorrect. Defendant must himself have the purpose or specific intent to cause the death of the victimbefore he can be found guilty of aggravated murder as an aider or abettor. Clark v. Jago; Johnson; Scott. That intent can be inferred from the facts and circumstances surrounding the crime. Lockett; Scott;Johnson; Clark v. Jago. It is incorrect, however, to say that if one accomplice has that specific intent to kill, then they all have it, because the specific intent to kill can be imputed to Defendant if any of his accomplices have it, Clark v. Jago, or that if Defendant aided or abetted the aggravated robbery, then he aided and abetted the aggravated murder. Scott. Such statements can easily be misinterpreted by a jury to mean that Defendant did not personally have to have a purpose or intent to kill, and that such a purpose or intent on the part of one of his accomplices is sufficient to convict Defendant. That relieves the State of its duty to prove that this particular defendant had a purpose to kill the victim. Scott; Clark v. Jago. Counsel's failure to object to these erroneous, albeit isolated statements constitutes deficient performance. *Page 9 
 {¶ 22} In determining whether the prosecutor's remarks were prejudicial, we must view the State's closing argument in its entirety.Bellew. In doing that we find that the prosecutor's erroneous statements were few and isolated. In the vast majority of its argument the State attempted, and correctly so, to argue the Lockett-Scott inference; that the jury could infer Defendant's purpose or intent to kill from the facts surrounding the crime if Defendant and the other participants entered into a common scheme to commit an armed robbery by the use of a deadly weapon and Defendant participated in that robbery knowing that an inherently dangerous instrumentality likely to produce death was going to be used to facilitate the robbery.
 {¶ 23} In its argument to the jury, the State claimed that Defendant was one of four men who entered into a plan to rob Nasru Fashions, that Defendant is the one who selected that store for the robbery, that Defendant entered the store and participated in the robbery, performing his role to distract the store owner while the gunman, Pendergrass, entered the store, knowing that one of his accomplices had a gun which was to be used to facilitate the robbery. During that robbery the accomplice with the gun shot and killed the store owner. Given these facts and circumstances, the State properly *Page 10 
argued, consistent with Lockett, that the jury could reasonably infer Defendant's specific intent to kill. That intent is properly inferred not from the fact that the actual shooter had a specific intent to cause death, as evidenced by his conduct in shooting the victim, but rather from Defendant's own conduct in participating in the robbery with knowledge that a gun would be used to facilitate the robbery.
 {¶ 24} In addition to the fact that a vast majority of the State's closing argument correctly argued that Defendant's purpose or intent to cause death could be inferred from the facts surrounding this crime, based upon the Lockett-Scott permissive inference, we also note that the trial court correctly instructed the jury on the aggravated murder charge and the State's burden of proof in that regard (see our disposition of the Second Assignment of Error). A jury is presumed to follow the trial court's instructions. State v. Loza (1994),71 Ohio St.3d 61, 75. Accordingly, Defendant has failed to demonstrate a reasonable probability that he would have been acquitted of the aggravated murder charge had his counsel objected to the prosecutor's few isolated erroneous statements during closing argument. The prejudice required for ineffective assistance of counsel has not been demonstrated. *Page 11 
 {¶ 25} Defendant also claims that his counsel performed deficiently by failing to object to inadmissible hearsay testimony by Njie's wife, Athena Bledsoe. She testified that on the day her husband was killed, following a prior, failed attempt to rob the store, Njie told Bledsoe that Defendant and Anthony Dominick had been in the store and tried to trick him by getting him to go to the back of the store. Defendant complains that this testimony was inadmissible hearsay that did not fit within any exception to the rule against hearsay, and that he was prejudiced by his counsel's failure to object to this evidence because the jury could have relied on it to infer that Defendant had the necessary specific intent or purpose to cause Njie's death.
 {¶ 26} We are not persuaded by Defendant's argument. Defendant's purpose or intent to cause death can reasonably be inferred from the other facts and circumstances surrounding the shooting, absent Bledsoe's hearsay testimony. Defendant knew that one of his accomplices had a loaded gun, an inherently dangerous instrumentality likely to cause death, that would be used to facilitate this robbery. He nevertheless participated in the robbery and fulfilled his role, which was to distract Mr. Njie while the gunman, Pendergrass, entered the store. Defendant did not flee from *Page 12 
the store until after Pendergrass had fired multiple shots. Given these circumstances, the jury could reasonably infer Defendant's purpose or intent to cause death from the facts surrounding the homicide, even without Bledsoe's testimony. Lockett; Scott. Accordingly, there is no reasonable probability that Defendant would have been acquitted of the aggravated murder charge had his counsel objected to the hearsay testimony by Bledsoe. The prejudice required for ineffective assistance of counsel is not demonstrated.
 {¶ 27} Defendant also complains that his counsel performed deficiently by failing to object to testimony by Detective Smith regarding whether Defendant's body language during his police interview, looking down toward the ground, is a sign of untruthfulness. After a video of Defendant's interview with Detective Smith at the police station was played for the jury, the prosecutor asked Detective Smith whether he was aware if a person's looking down toward the ground was any indication of a person's truthfulness. Detective Smith replied that it is a sign of "untruthfulness or shame." Defendant claims that this testimony was inadmissible because a police officer's opinion that an accused is not being truthful is not admissible, State v. Davis, 116 Ohio St.3d 404,2008-Ohio-2 at ¶ 122, and the credibility of a witness is a matter for the trier of facts to *Page 13 
determine, State v. DeHass (1967), 10 Ohio St.2d 230. Defendant argues that his counsel's failure to object to this testimony prejudiced him because his credibility was a crucial issue in this case which came down to his word against that of his accomplices, Pendergrass and Smith.
 {¶ 28} While Detective Smith did testify that looking down toward the ground was a sign of untruthfulness or shame, he did not testify that Defendant was untruthful during his police interview. More importantly, because of the overwhelming evidence of Defendant's guilt, Detective Smith's comment did not result in plain error, Davis, and we find no reasonable probability that Defendant would have been acquitted of the aggravated murder charge had his counsel objected to Detective Smith's comment. The prejudice required for ineffective assistance of counsel has not been demonstrated.
 {¶ 29} Finally, Defendant complains that his counsel performed deficiently by failing to object to the prosecutor's "vouching" for the State's key witnesses, Pendergrass and Smith, who were Defendant's accomplices. According to Defendant, this vouching took the form of both statements made by the prosecutor during closing argument, that "they told you everything" and "they told you exactly what happened," and *Page 14 
plea agreements between the State and these two witnesses that were admitted into evidence. Those plea agreements stated that the State could nullify the agreements if Pendergrass or Smith were deceptive in polygraph exams or if they testified falsely. Defendant argues that his counsel's failure to object to this improper vouching evidence prejudiced him because his credibility in this case was a key issue as the case came down to his word against that of Pendergrass and Smith.
 {¶ 30} In State v. Russell, Montgomery App. No. 21458, 2008-Ohio-774, this court stated that because an attorney may not express a personal belief or opinion as to the credibility of a witness, citing State v.Smith (1984), 14 Ohio St.3d 13, it was improper for the State to elicit from its own witness that she had agreed to take a polygraph test and that her plea agreement with the State was contingent upon her passing that test. However, we did not find that the admission of that improper vouching evidence amounted to plain error, because other witnesses testified to the defendant's involvement in the crime, and we could not discount the possibility that the jury might have found this witness credible even absent the testimony about her willingness to take a polygraph examination. Id. at ¶ 122. *Page 15 
 {¶ 31} In this case, unlike Russell, the State did not elicit from either Pendergrass or Smith any testimony about their willingness to take a polygraph exam. Rather, the plea agreements between these witnesses and the State that were admitted into evidence contained references to the right of the State to nullify those agreements in the event Pendergrass or Smith were deceptive in their polygraph examinations. To the extent that these two witnesses were present in court and testified, an implication arises that they passed any polygraph examination they were asked to take. Such evidence is inadmissible, Russell, and defense counsel performed deficiently by failing to object to it.
 {¶ 32} Nevertheless, we cannot conclude that there is a reasonable probability that Defendant would have been acquitted of the aggravated murder charge had his counsel objected to this evidence. The reference to polygraph examinations in the plea agreements does not indicate that either Pendergrass or Smith had in fact asked to take or did take such an examination, much less what the results were. Furthermore, we cannot discount the possibility that the jury could have found Pendergrass and Smith credible, even absent any reference to polygraph exams.Russell.
 {¶ 33} We also note that, inasmuch as the plea agreements *Page 16 
contained no information about whether either Pendergrass or Smith had ever been asked to take or had taken a polygraph examination, counsel's failure to object to that evidence may have been a strategic decision. Those plea agreements portray the existence of a motive for Pendergrass and Smith to testify against Defendant, and preponderate against their credibility. That either had agreed to take a polygraph exam if asked reinforces their credibility. Trial tactics, even debatable ones, do not constitute deficient performance. State v. Clayton (1980),62 Ohio St.2d 45. No ineffective assistance of counsel has been demonstrated.
 {¶ 34} Defendant's first assignment of error is overruled.
SECOND ASSIGNMENT OF ERROR
 {¶ 35} "THE COURT VIOLATED MR. WHITFIELD'S RIGHT TO DUE PROCESS OF LAW UNDER THE OHIO AND UNITED STATES CONSTITUTIONS WHEN INSTRUCTING THE JURY ON THE AGGRAVATED MURDER CHARGE."
 {¶ 36} In this assignment of error, Defendant purports to challenge the adequacy of the trial court's jury instructions on the aggravated murder charge, particularly with respect to the essential element that Defendant must have had a purpose or specific intent to cause the victim's death. Defendant's argument focuses not on the actual instructions given to the jury by the trial court, but rather on the prosecutor's *Page 17 
statements in closing argument, which Defendant contends relieved the State of its burden of proving that Defendant had a purpose or specific intent to cause the victim's death.
 {¶ 37} The trial court properly instructed the jury on aggravated murder and the State's burden of proof. The court instructed the jury that the State must prove each and every element of the offense charged beyond a reasonable doubt before Defendant can be found guilty of the offense, regardless of whether Defendant is the principal offender or an aider and abettor. With respect to complicity, the trial court instructed the jury:
 {¶ 38} "The law provides two ways in which criminal responsibility may be placed upon the Defendant. First that the Defendant was the principal offender; that is, the Defendant did all the acts which make up all the elements of the particular offense charged in the indictment.
 {¶ 39} "The other way for placing criminal responsibility on the Defendant is that the Defendant aided and abetted one or more persons in committing an offense or offenses knowing that he was facilitating the offenses charged in the indictment. This is known as complicity."
 {¶ 40} "* * *
 {¶ 41} "An aider and abettor is a person who knowingly *Page 18 
aided or abetted. Aided or abetted means supported, assisted, encouraged, cooperated with, advised or incited. An aider and abettor is regarded as if he were the principle offender and is just as guilty as if he personally performed every act constituting the offense.
 {¶ 42} "When two or more persons have a common purpose to commit a crime and one does one part and another performs another part, those acting together are equally guilty of the crime.
 {¶ 43} "A person acts knowingly when he is aware of the existence of the facts and that his acts will probably cause a certain result." (T. 797-798).
 {¶ 44} With respect to aggravated murder, the trial court instructed the jury as follows:
 {¶ 45} "Regarding Count I, aggravated murder, before you can find the Defendant guilty of Count I, you must find beyond a reasonable doubt that on or about the 30th day of September 2004 and in Montgomery County, Ohio the Defendant did purposely and while committing or attempting to commit or while fleeing immediately after committing or attempting to commit aggravated robbery caused the death of Mamadou Njie there and then a living human being.
 {¶ 46} "Purpose is an essential element of the offense of *Page 19 
aggravated murder. A person acts purposely when it is his specific intention to cause a certain result. It must be established in this case that at the time in question there was present in the mind of the Defendant a specific intention to cause the death of Mamadou Njie while committing or attempting to commit or while fleeing immediately after committing or attempting to commit aggravated robbery.
 {¶ 47} "Purpose is a decision of the mind to do an act with a conscious objective of producing a specific result. To do an act purposely is to do it intentionally and not accidentally. Purpose and intent mean the same thing. The purpose with which a person does an act is known only to himself unless he expresses it to others or indicates it by his conduct. The purpose with which a person does an act is determined from the manner in which it is done, the weapon used and all the other facts and circumstances in evidence.
 {¶ 48} "If a wound is inflicted upon a person with a deadly weapon in a manner calculated to destroy life, the purpose to cause the death may be, but is not required to be inferred from the use of the weapon. The inference, if made, is not conclusive." (T. 799-800).
 {¶ 49} At oral argument, Defendant's counsel contended that the trial court's jury instructions were rendered inadequate *Page 20 
and incorrect by the prosecutor's statements during closing argument, which effectively relieved the State of its burden of proving that Defendant had a purpose or specific intent to cause the victim's death. The contention suggests that the trial court then had a duty to sua sponte correct the prosecutor's misstatements, and that its failure to do so constitutes plain error. We disagree.
 {¶ 50} The trial court did not have an absolute duty to correct the prosecutor's unobjected-to statements during closing argument, which for the most part were attempts to correctly argue that the jury could reasonably infer Defendant's purpose or intent to kill based upon theLockett-Scott inference. (See our disposition of Error I). The trial court's duty was to give correct instructions to the jury on all of the elements of aggravated murder, including the purpose or specific intent to kill, which it did.
 {¶ 51} The court's instructions were correct statements of law, and they did not relieve the State of its burden of proof on the essential mens rea element of purpose or specific intent to cause death. It is presumed that the jurors followed the instructions given by the trial court. Pang v. Minch (1990), 53 Ohio St.3d 186; State v. Ritchie (July 25, 1997), Montgomery App. No. 15792. That presumption would *Page 21 
remedy the effect of the few incorrect representations the prosecutor made.
 {¶ 52} Defendant's second assignment of error is overruled.
THIRD ASSIGNMENT OF ERROR
 {¶ 53} "THE TRIAL COURT ERRED WHEN IT OVERRULED MR. WHITFIELD'S MOTION TO SUPPRESS THE STATEMENTS HE MADE TO POLICE ON OCTOBER 5, 2004."
 {¶ 54} Defendant argues that the trial court erred in overruling his motion to suppress statements he made to Detective Smith on October 5, 2004, because he was in custody during that interview and police failed to advise him of his rights pursuant to Miranda v. Arizona (1966),384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. The trial court concluded, following a hearing, that Defendant was not in custody during his interview with Detective Smith, and therefore Miranda warnings were not required. In so finding, the trial court stated that it found Detective Smith more credible than Defendant, to the extent their testimony conflicts.
 {¶ 55} In a motion to suppress, the trial court assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses.State v. Clay (1972), 34 Ohio St.2d 250. Accordingly, in our review, we are bound to accept *Page 22 
the trial court's findings of fact if they are supported by competent, credible evidence. Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard. State v.Retherford (1994), 93 Ohio App.3d 586.
 {¶ 56} Under Miranda v. Arizona, supra, before a person is subjected to custodial interrogation he or she is entitled to certain warnings. Custodial interrogation is questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.384 U.S. at 444. A person is in custody for purposes of Miranda when there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. Oregon v. Mathiason (1977),429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714; State v. White, Montgomery App. No. 18731, 2002-Ohio-262. The test to determine whether there is a sufficient restraint on freedom of movement is whether a reasonable person in the suspect's situation would understand that he was in a custodial situation. Berkemer v. McCarty (1984), 468 U.S. 420,104 S.Ct. 3138, 82 L.Ed.2d 317; White.
 {¶ 57} Defendant testified that four armed police officers *Page 23 
came to his home and told him that they needed to take him to the police station for questioning. Defendant agreed to go with them. Defendant testified that he was handcuffed behind his back, placed in the rear of a marked cruiser, and transported to the police station. Defendant said he was escorted to an interview room, where police removed Defendant's handcuffs. Defendant testified that he was not told he was under arrest.
 {¶ 58} Detective Smith, the interviewer, who was not one of the four officers involved in Defendant's apprehension, testified that Defendant voluntarily came to the police station, that he was driven there by officers, that Defendant was not handcuffed when Smith encountered him in the interview room or at any time during the interview, and that Defendant was a witness, not a suspect. At the start of the interview, Defendant asked Detective Smith if he was charged with anything, and Detective Smith replied, "No." Detective Smith testified that he did not give Defendant Miranda warnings because Defendant was not in custody. Detective Smith did not testify that he ever told Defendant that he was free to leave at anytime, that he was not under arrest, or that he did not have to answer his questions. Smith testified that Defendant did, in fact, leave after the interview ended, and that *Page 24 
Smith drove Defendant back to his neighborhood.
 {¶ 59} While the trial court found Detective Smith more credible, there is no material conflict between his testimony and Defendant's. Smith first encountered Defendant in the interview room, after his handcuffs had been removed. Smith told Defendant he was not charged with a crime, which was correct. But the question presented is whether the events involved in Defendant's transport to the police station by other officers created conditions of custody for purposes of Miranda.
Statements Defendant made to police during interrogation tended to implicate him in the crimes of which he was convicted, and were offered in evidence by the State in his trial.
 {¶ 60} As an initial matter, even if Detective Smith was unaware of the particular facts and circumstances that preceded his encounter with Defendant, that did not relieve the State of its burden to comply withMiranda. An officer who performs an interrogation is charged by law with the obligation that Miranda imposes. The State cannot avoid that burden by compartmentalizing the actions of its officers to create an ignorance of the facts or its appearance. Furthermore, the paramount issue is not what the interrogating officer knew, but whether the suspect was denied his *Page 25 Fifth Amendment rights because he was interrogated while in police custody. That is an objective inquiry, one necessarily viewed from the perspective of the detainee whose Fifth Amendment rights are in issue.
 {¶ 61} Defendant was at home when four armed police officers appeared at his door. They told Defendant they wanted to question him at police headquarters. He agreed to their request and was handcuffed, and then placed in a marked police cruiser to be transported downtown. He was led into the police station in handcuffs, and then put in an interview room. There, the cuffs were then removed, and an officer who had not participated in Defendant's apprehension appeared and questioned him. In our view, Defendant had by then been significantly deprived of his freedom of movement. Therefore, before Detective Smith commenced interrogating Defendant, Miranda warnings were required.
 {¶ 62} The State argues that because police viewed Defendant as a "witness" and not a suspect, and because Detective Smith told Defendant he'd not been charged with a crime, and because Defendant was returned home after the interrogation, Defendant was not in custody.Miranda holds that its warnings must be given before custodial interrogation commences. What happens after the interrogation concludes is *Page 26 
immaterial. Defendant was not "charged" with a crime, but the circumstances of his detention were nevertheless custodial in nature. And, even if officers viewed Defendant as a witness, which seems at odds with the facts of the crime they were investigating, that does not permit them to employ custodial methods in connection with their interrogation absent Miranda warnings.
 {¶ 63} There may be valid reasons why any person, including a mere witness, is secured in handcuffs before being placed in a police cruiser. Officer safety is a prime consideration. In that event, explaining the need to employ handcuffs might lessen the custodial character of the person's encounter with police. That was not done here. Neither were the cuffs removed when Defendant emerged from the cruiser, and not until he was led into the police station and placed in the interview room. Those matters, following Defendant's apprehension at home by four armed police officers, demonstrate a custodial detention that required Miranda warnings before any interrogation commenced.
 {¶ 64} At oral argument, the assistant prosecutor contended that during his testimony Defendant stated that he did not believe he was in custody. After carefully reviewing the record, we conclude that it does not go that far. The *Page 27 
relevant portion of Defendant's testimony is as follows:
 {¶ 65} "A The second time I came down here voluntarily. The first time, they asked if they could ask me questions, but they also placed me in handcuffs.
 {¶ 66} "Q But I'm talking about the first time on the videotape was from October the 5th, 2004. You said on that tape that you came down voluntarily, that you were cooperating.
 {¶ 67} "A I mean — I mean, yes, I was cooperating. I mean, I wasn't putting up no fights or nothing. That's what you asked me.
 {¶ 68} "Q Okay. But when you say you came down voluntarily, did you tell Detective Smith that you were handcuffed and forced to come down?
 {¶ 69} "A No, ma'am.
 {¶ 70} "Q Were you forced to come down?
 {¶ 71} "A Yes.
 {¶ 72} "Q By what was the detective's name that bought you down in handcuffs?
 {¶ 73} "A I think it was the detective that was making the tape.
 {¶ 74} "Q Detective Elzholz?
 {¶ 75} "A I guess that's his name. *Page 28 
 {¶ 76} "Q Do you know or are you just thinking that?
 {¶ 77} "A I don't know for sure his name, but I think so.
 {¶ 78} "Q But you were not arrested; is that correct?
 {¶ 79} "A Right.
 {¶ 80} "Q And you were free to go?
 {¶ 81} "A Right.
 {¶ 82} "Q And you made those statements voluntarily?
 {¶ 83} "A Yes.
 {¶ 84} "MS. HOBSON: No further questions, Your Honor.
 {¶ 85} "THE COURT: Further questions?
 REDIRECT EXAMINATION {¶ 86} BY MR. HARRISON:
 {¶ 87} "Q You said — to the leading question, you said you weren't arrested. You were in handcuffs, weren't you?
 {¶ 88} "A Right. I mean they ain't say I was under arrest.
 {¶ 89} "Q They didn't use the word arrest.
 {¶ 90} "A Right.
 {¶ 91} "Q Okay. But you were under arrest, weren't you?
 {¶ 92} "A I was — basically, yes, I was in handcuffs.
 {¶ 93} "Q Well, it was a pretty good act, wasn't it?
 {¶ 94} "A Yes. *Page 29 
 {¶ 95} "Q Okay. So you were in handcuffs and they told you that they're taking you down no matter what; right?
 {¶ 96} "A Right.
 {¶ 97} "Q And how many police officers were there; three?
 {¶ 98} "A Four.
 {¶ 99} "Q Four. Four police officers?
 {¶ 100} "A Yes.
 {¶ 101} "Q And they were armed; correct?
 {¶ 102} "A Yes.
 {¶ 103} "Q And you were unarmed; correct?
 {¶ 104} "A Right.
 {¶ 105} "Q And you were going to do exactly what the told you to do?
 {¶ 106} "A Yes.
 {¶ 107} "Q And you did; correct?
 {¶ 108} "A Yes.
 {¶ 109} "Q So, regardless of the niceties or the words used, whether arrest or custody, you certainly were in custody, were you not?
 {¶ 110} "A Yes.
 {¶ 111} "MR. HARRISON: Nothing further.
 {¶ 112} "THE COURT: Anything further of this witness? *Page 30 
 {¶ 113} "MR. HOBSON: No, Your Honor.
 {¶ 114} "THE COURT: Thank you. You may step down.
 {¶ 115} "(Witness excused.)" (T. 74-76).
 {¶ 116} His testimony reveals that Defendant came to the police station voluntarily, in the sense that he acquiesced in the request of the four officers, but that in that respect he was "forced" to go with them. Defendant explained that when he said he was not arrested, he meant that the officers never used those words to tell him he was under arrest, but he was placed in handcuffs and therefore was in custody. Even when viewed from Defendant's subjective point of view, this record demonstrates that Defendant was in custody for purposes ofMiranda, and therefore the State was subject to its burden of complying with Miranda.
 {¶ 117} The trial court's pronouncement that it found Detective Smith "more credible" does not resolve any conflict between his testimony and Defendant's concerning the events that preceded Smith's interrogation, because there were none. Perhaps it indicates a belief in Smith's good faith, but an officer's good faith is not determinative of the issue of law Miranda presents. We find that the trial court erred when it denied Defendant's motion to suppress his statements to police during his interview, because the circumstances of Defendant's *Page 31 
apprehension and detention were sufficiently custodial in character to require Miranda warnings before his interrogation commenced, and none were given.
 {¶ 118} Defendant's third assignment of error is sustained.
FOURTH ASSIGNMENT OF ERROR
 {¶ 119} "THE TRIAL JUDGE ERRED IN ALLOWING THE STATE TO SHOW GRUESOME AUTOPSY PHOTOGRAPHS OVER THE DEFENDANT'S OBJECTION."
 {¶ 120} Defendant argues that the trial court abused its discretion in admitting, over his objection, various autopsy photographs depicting gunshot wounds to the internal organs, the lung and small intestine, of the victim, State's Exhibits 78, 79, 82 and 83, because their probative value was substantially outweighed by the danger of unfair prejudice which resulted from their gruesome nature. Evid. R. 403(A). The trial court concluded that the photographs were necessary to help the jury understand the coroner's testimony regarding medical issues and the cause of death, and that their probative value was not substantially outweighed by the danger of unfair prejudice. We agree.
 {¶ 121} In State v. Wade, Montgomery App. No. 21530, 2007-Ohio-1060, this court observed: *Page 32 
 {¶ 122} "{¶ 30} The admission or exclusion of evidence such as photographs is left to the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of that discretion. State v.Morales (1987), 32 Ohio St.3d 252, 257;
 {¶ 123} State v. Simpson (February 13, 2004), Montgomery App. No. 19797, 2004-Ohio-669. An abuse of discretion means more than a mere error of law or an error in judgment. It implies an arbitrary, unreasonable, unconscionable attitude on the part of the trial court.State v. Adams (1980), 62 Ohio St.2d 151.
 {¶ 124} "{¶ 31} The State had the burden to prove that Defendant purposely caused his wife's death. R.C. 2903.02(A). The particular cause of her death was susceptible to proof through the testimony of the physician who performed the autopsy. The slides/photographs were clearly probative of such matters and were presented during the testimony of Dr. Russell Uptegrove, who performed the autopsy on Cynthia Wade, for the purpose of explaining to the jury his opinion concerning the cause of Mrs. Wade's death by illustrating the location and severity of the stab wounds inflicted by Defendant and his purpose in doing so.Simpson. Each photograph had independent probative value for that purpose, and we cannot say that the *Page 33 
probative value was substantially outweighed by the danger of unfair prejudice to Defendant."
 {¶ 125} The trial court properly admitted the autopsy photographs at issue in this case because they helped the jury to understand the coroner's testimony regarding the cause of Njie's death, and those photographs were relevant and probative of the allegation that Defendant purposely caused Njie's death. The photographs, which depicted the damage done to Njie's internal organs by the gunshots which resulted in his death, depicted things the other autopsy photographs did not. The probative value of these autopsy photographs was not substantially outweighed by the danger of unfair prejudice. As we stated inWade, at ¶ 35:
 {¶ 126} "Autopsy photos are inherently prejudicial when they depict gruesome, graphic wounds, but when offered to prove elements of the offense that the State has the burden of proving, they are usually notunfairly prejudicial. That is the case here."
 {¶ 127} The trial court did not abuse its discretion in admitting the autopsy photographs.
 {¶ 128} Defendant's fourth assignment of error is overruled.
 FIFTH ASSIGNMENT OF ERROR: *Page 34 
 {¶ 129} "THE GUILTY VERDICT ON THE AGGRAVATED MURDER CHARGE WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND NOT SUPPORTED BY SUFFICIENT EVIDENCE."
 {¶ 130} Defendant argues that his conviction for aggravated murder is not supported by legally sufficient evidence and is against the manifest weight of the evidence because the State failed to prove (1) that Defendant acted as an aider or abettor, i.e. that he supported or assisted the principal offender (Alexander Pendergrass) in purposely causing Mr. Njie's death during the aggravated robbery, and (2) that Defendant harbored in his own mind any purpose or specific intent to cause Njie's death.
 {¶ 131} A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law. State v. Thompkins, (1997), 78 Ohio St.3d 380. The proper test to apply is the one set forth in paragraph two of the Syllabus of State v.Jenks (1991), 61 Ohio St.3d 259:
 {¶ 132} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince *Page 35 
the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."
 {¶ 133} A weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive. State v. Hufnagle (Sept. 6, 1996), Montgomery App. No. 15563. The proper test to apply to that inquiry is the one set forth in State v. Martin (1983),20 Ohio App.3d 172, 175:
 {¶ 134} "[T]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Accord: State v.Thompkins, supra.
 {¶ 135} In order to find that a manifest miscarriage of justice occurred, an appellate court must conclude that a guilty verdict is "against," that is, contrary to, the manifest weight of the evidence presented. See, State v. *Page 36 McDaniel (May 1, 1998), Montgomery App. No. 16221. The fact that the evidence is subject to different interpretations on the matter of guilt or innocence does not rise to that level.
 {¶ 136} The credibility of the witnesses and the weight to be given to their testimony are matters for the trier of facts primarily to resolve.State v. DeHass (1967), 10 Ohio St.2d 230. In State v. Lawson (August 22, 1997), Montgomery App. No. 16288, we explained:
 {¶ 137} "[B]ecause the factfinder . . . has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness."
 {¶ 138} This court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the trier of facts lost its way in arriving at its verdict. State v. Bradley (Oct. 24, 1997), Champaign App. No. 97-CA-03.
 {¶ 139} Defendant was convicted of aggravated murder in *Page 37 
violation of R.C. 2903.01(B) which required the State to prove that Defendant purposely caused the death of Mr. Njie while committing or attempting to commit aggravated robbery. Defendant was tried as an aider and abettor under R.C. 2923.03(A)(2).
 {¶ 140} In State v. Johnson, 93 Ohio St.3d 240, 2001-Ohio-1336, the Ohio Supreme Court stated:
 {¶ 141} "To support a conviction for complicity by aiding and abetting pursuant to R.C.2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime." Syllabus.
 {¶ 142} In arguing that the evidence fails to demonstrate that he supported or assisted the principal offender, or that he harbored any purpose to cause Njie's death, Defendant points out that when Pendergrass started shooting, Defendant ran out of the store.
 {¶ 143} The evidence presented in this case demonstrates that Defendant was one of four people who engaged in a plan to commit armed robbery, and that during the robbery *Page 38 
one of Defendant's accomplices, Pendergrass, shot and killed the owner of the store being robbed. Defendant was part of the plan, and had suggested Nasru Fashions as a target for the robbery. Furthermore, Defendant had a role to play during the robbery which he fulfilled: he helped Otis Smith distract Mr. Njie while Pendergrass entered the store. When Defendant participated in this robbery, he knew that one of his accomplices had a loaded gun that was to be used to facilitate the robbery. Defendant never once indicated that he did not want to participate in the robbery, and he did not flee from the store until after Pendergrass began firing his gun. Under these facts and circumstances, the evidence presented is sufficient to prove beyond a reasonable doubt that Defendant participated in this armed robbery and aggravated murder as an aider and abettor, and the jury could reasonably infer Defendant's purpose to cause Mr. Njie's death from the facts and circumstances surrounding the crime. Lockett; Scott.
 {¶ 144} Viewing the totality of the evidence in this case, including the testimony of Defendant's accomplices, in a light most favorable to the State, as we must, a rational trier of facts could find all of the essential elements of aggravated murder proven beyond a reasonable doubt. Defendant's conviction is supported by legally sufficient *Page 39 
evidence.
 {¶ 145} Reviewing the record as a whole, we cannot say that the evidence weighs heavily against a conviction, that the jury lost its way in choosing to believe the State's witnesses, or that a manifest miscarriage of justice occurred. Defendant's conviction for aggravated murder is not against the manifest weight of the evidence.
 {¶ 146} Defendant's fifth assignment of error is overruled.
SIXTH ASSIGNMENT OF ERROR
 {¶ 147} "THE TRIAL JUDGE ERRED IN ORDERING MR. WHITFIELD TO PAY RESTITUTION WITHOUT FIRST DETERMINING MR. WHITFIELD'S ABILITY TO PAY."
 {¶ 148} Defendant argues that the trial court erred by ordering him to pay five hundred dollars restitution to the widow of the deceased victim without considering his ability to pay per R.C. 292919(B)(6).
 {¶ 149} In State v. Hill, Clark App. No. 04CA0047, 2005-Ohio-3877, this court stated:
 {¶ 150} "{¶ 11} Before imposing a monetary restitution requirement as a part of a criminal sentence, the court must `consider the offender's present or future ability to pay.' R.C. 2929.19(B)(6). Further, the record must affirmatively *Page 40 
reflect the court's consideration of those questions in the offender's case. State v. Martin (2000), 140 Ohio App.3d 326, 747 N.E.2d 318."
 {¶ 151} In State v. Lenton, Clark App. No. 06CA0091, 2007-Ohio-5180, we further observed:
 {¶ 152} "{¶ 14} `A hearing on a defendant's ability to pay is not mandated, though the trial court may hold a hearing if necessary to determine the issue. R.C. 2929.18(E). Neither is the court obligated to make any express findings on the record regarding a defendant's ability to pay a financial sanction, although in our opinion that is clearly the better practice.
 {¶ 153} State v. Ayers (January 7, 2005), Greene App. No. 2004CA0034,2005-Ohio-44. All that is required is that the trial court "consider" a defendant's ability to pay. Id. A finding that a defendant is indigent for purposes of appointed counsel does not shield the defendant from paying court costs or a financial sanction. Id.'"
 {¶ 154} At the sentencing hearing the trial court indicated that it had reviewed the presentence investigation report in this case. Such reports contain information about Defendant's age, health, education, and employment history. The trial court's review of the presentence report is *Page 41 
sufficient to demonstrate that the court considered Defendant's ability to pay a financial sanction. Lenton; State v. Felder, Montgomery App. No. 21076, 2006-Ohio-2330; State v. Parker, Champaign App. No. 03CA17,2004-Ohio-1313.
 {¶ 155} Defendant's sixth assignment of error is overruled.
SEVENTH ASSIGNMENT OF ERROR
 {¶ 156} "THE CUMULATIVE EFFECT OF THE ERRORS DEPRIVED MR. WHITFIELD OF HIS RIGHT TO A FAIR TRIAL."
 {¶ 157} Defendant argues that even if we find that none of the individual errors he assigns, standing alone, constitutes reversible error, the cumulative effect of those errors deprived him of a fair trial. State v. DeMarco (1987), 31 Ohio St.3d 191. This doctrine of cumulative error is not applicable in this case, however, because Defendant has failed to establish multiple instances of error. State v.Garner, 74 Ohio St.3d 49, 1995-Ohio-168, ¶ 33; State v. Sapp, Clark App. No. 99CA84, 2002-Ohio-6863.
 {¶ 158} Defendant's seventh assignment of error is overruled.
 Conclusion {¶ 159} Having sustained Defendant's third assignment of error, we will reverse his convictions and remand the case *Page 42 
for a new trial on the charges against him.
BROGAN, J. concurs.
FAIN, J., concurs in judgment.